## THE STATE v. FOLEY, *Appellant.*

### Division Two, June 14, 1898.

1. **Murder:** PANEL: FORTY MEN. On an indictment of murder in the first degree, unless the State elects to prosecute for a lower grade of homicide than that charged, the defendant is entitled to a panel of forty qualified impartial jurors.

2. ————: INCOMPETENT JUROR: FORMING AND EXPRESSING OPINION: NEWSPAPER REPORTS. If a person has formed or expressed an opinion upon his own knowledge of the facts in a case, or from conversing with witnesses, or if his opinion has been engendered by hearing the witnesses testify under oath in a former trial of the same case, he is incompetent to serve as a juror. So that a juror who had talked with one witness and read a report of the sworn testimony in a newspaper was incompetent. And another who had discussed defendant's guilt with his neighbors, had been present at a former trial and heard the witnesses testify, and had formed and expressed a positive opinion and still retained it, but stated that he could give the defendant a fair trial, was incompetent.

3. ————: EVIDENCE: CONCLUSIONS AND OPINION OF WITNESS. It is the duty of a witness to testify to facts within his knowledge, and it is the province of the jury to estimate the value of such facts as evidence in the case, and he must not be permitted to so detail his testimony as to tell the jury what it proves. In this case in attempting to give an admission of the defendant, the witness was permitted to repeat an array of statements *he* had made in the presence of the witness *and* an argument that this summation of facts proved *defendant's* guilt, to which he claimed defendant entered no denial. *Held* to be reversible error.

4. ————: ————: ————. The opinions of witnesses are not competent at all, if all the facts can' be ascertained and made intelligible to the jury, and are such as ordinary men are usually capable of understanding.

5. ————: DEFENDANT'S SILENCE. A defendant's silence when charges are judicially made against him, or when he is under arrest, can not be shown against him.

State v. Foley.

6. ———: PRACTICE: IMPROPER EVIDENCE: TIME TO OBJECT. When
the form of a question gives no intimation of the irrelevant and
incompetent answer which a witness makes in response thereto, the
proper course is to move the court when it is made to exclude it from
the jury, and it can not then be urged that said motion comes too
late; and an omission to object when such a question is asked, is no
waiver of the right to move to exclude.

7. ———: MOTIVE. The absence of motive is in no sense conclusive
of the innocence of the defendant, but it is a circumstance in his
favor which he is entitled to have the jury weigh in considering his
guilt or innocence, in a case made up of purely circumstantial
evidence.

8. ———: ———: INSTRUCTIONS. The trial court gave this instruc-
tion on behalf of the State, in a case founded on circumstantial
evidence: "If you find from the evidence that the defendant mur-
dered Elizabeth Foley, as charged in the indictment, it is your duty
to find him guilty, no matter whether any motive for the deed be
apparent or not." This instruction is *held* to be correct, but having
been given, it was error to refuse this one asked by defendant:
"The court instructs the jury that the absence of any probable
motive for the commission of the crime charged in the indictment, is
a circumstance which must be considered in favor of defendant."

## Appeal from Clay Circuit Court.—HON. E. J. BROADDUS, Judge.

REVERSED AND REMANDED.

*H. F. Simrall, John Dougherty* and *B. L. Wood-
son* for appellant.

(1) The defendant, under the laws of the State
of Missouri, was entitled to a full panel of qualified
jurors before he was required to make his peremptory
challenges. *State v. McCannon*, 51 Mo. 27; *State v.
Waters*, 62 Mo. 196; *State v. Davis*, 66 Mo. 684;
Const., art. II, sec. 22; R. S. 1889, sec. 4197; *Green-
field v. People*, 74 N. Y. 277. (2) Some of these
jurors attended the former trial a day or half a day,
and heard some of the witnesses testify, some of them
conversed with a witness in regard to the case, read

the Liberty *Tribune* which gave substantially the testimony in the case. And so appellant in this cause clearly shows by the record herein that upon the trial below he was denied that constitutional guarantee, which is the most important security of a fair trial—an impartial jury of the county. *State v. Culler*, 82 Mo. 623; *State v. Hultz*, 106 Mo. 41; *State v. Robinson*, 117 Mo. 649; *Greenfield v. People*, 74 N. Y. 277; . Thomps. and Marr. on Juries; sec. 220. (3) Gross error was committed by the court in the matter of the conversation held by Land and Talbott with the defendant. Queen's case, 2 Brod. &. Bingham, 298; *Prince v. Samo*, 7 A. & E. 627; *State v. Braudette*, 65 Mo. 149; *State v. Young*, 99 Mo. 674; *U. S. v. Bram*, 18 S. C. Rep. 183. (4) There is such a conflict and inconsistency between instruction numbered 9, given for the State, and the instruction given for the defendant upon the same subject as to constitute reversible error.

*Edward C. Crow*, Attorney-General, for the State.

(1) The prosecution is never bound to establish an adequate motive for the commission of a crime, nor, indeed, any motive at all for the alleged crime. The fact of homicide being established, the inability to discover the motive does not disprove the crime. *McLain v. Comm.*, 99 Pa. St. 96; Wills on Circum. Ev., 47 and 249. (2) The objection to testimony of witness Land, detailing conversation had in a room adjacent to the sheriff's office, is not a legal objection. There is nothing in the record to show that defendant was under duress, or that inducements or threats were held out to him; he was not bound to talk; he was not bound to be interviewed. What he said was voluntary on his part. *State v. Anderson*, 96 Mo. 241; *State v. Patterson*, 73 Mo. 695; *State v. Hopkirk*,

84 Mo. 278; *State v. Myers*, 99 Mo. 107; *State v. Patterson*, 73 Mo. 695. (3) The jurors were competent under the decisions in this State. *State v. Taylor*, 35 S. W. Rep. 92; *State v. Bryant*, 93 Mo. 273; *State v. Duffie*, 124 Mo. 1; *People v. Reynolds*, 16 Cal. 128; *State v. Williamson*, 106 Mo. 169; *State v. Cunningham*, 100 Mo. 386; *State v. Dyer*, 139 Mo. 199; *State v. Dunlap*, 9 Tex. App. 179.

*J. J. Williams* also for the State.

(1) The ground for challenging the six jurors was that they were "incompetent." No specific cause was given. This is insufficient. *State v. Taylor*, 134 Mo. 142; *State v. Smith*, 114 Mo. 406; *State v. Moon*, 117 Mo. 395. (2) Persons who have formed opinions from rumor, or newspaper reports, are not for that reason disqualified as jurors, where they believe they can give the defendant a fair and impartial trial. *State v. Duffy*, 106 Mo. 102; *State v. Robinson*, 117 Mo. 649; *State v. Taylor*, 134 Mo. 141. (3) The defendant did not object to the question of the prosecuting attorney which called for the whole conversation between Land and Talbott and defendant, but did move to strike out all the testimony of the witness on that point. *State v. Dickson*, 78 Mo. 448. The exception should be taken at the time of the supposed error and reiterated in the motion for a new trial. *State v. DeMosse*, 98 Mo. 340; *State v. Crab*, 121 Mo. 563.

GANTT, P. J.—At the February term, 1897, of the circuit court of Clay county the defendant was indicted for the murder of his mother, Mrs. Elizabeth Foley, on the seventeenth of November, 1896. He was duly arraigned and went to trial at the June term, 1897, but a mistrial resulted owing to the disagreement of the jury. The cause was continued to the November

term, 1897, at which time it was tried and defendant convicted of murder in the first degree. In due time motions for new trial and in arrest were filed and over-ruled and defendant sentenced to be hanged. From that conviction this appeal is prosecuted.

The State relied entirely upon circumstantial evidence. At the time of the alleged murder the Foley family consisted of the widowed mother, Mrs. Elizabeth Foley, two daughters, Misses Fannie and Amelia Foley, and one son, the defendant, William S. Foley. The father of defendant had been dead five or six years. Another married daughter, Mrs. Morrow, and her husband, lived about three quarters of a mile from the Foley homestead. The Foley family were comfortably fixed financially and had lived on the same farm for a quarter of a century and enjoyed the esteem and respect of all their neighbors. At the time of the homicide of which he was convicted defendant was thirty-three years old and unmarried. On the seventeenth day of November, 1896, defendant attended a sale of Jersey cattle at the farm of Mr. Wymore, a neighbor. He ate his breakfast at home that morning, and took the blacking brush and a bootjack, which he kept in his room in a box, and laid the bootjack on a freshly painted bench on the porch and polished his shoes and left home in a buggy, driving a pair of mules. He went first to Mr. Talbott's. After he left, his sister Amelia put the blacking and the brush away, but left the bootjack on the bench. Having reached George Talbott's, that gentleman rode in defendant's buggy and led his horse. They went first to Liberty and thence to Wymore's, arriving at the sale about 10 or 11 o'clock. He and Talbott remained at the sale until 3:30 o'clock in the afternoon, and then started to their homes. Talbott rode with defendant in his buggy until they reached the fork of the

roads, when Talbott went to his home horseback, and
defendant drove on home, arriving there at 4:20 o'clock
that afternoon. After reaching home defendant un-
hitched his team, fed his hogs, turned his horse out
and then went to the house. Mrs. Foley, Misses Fan-
nie and Amelia and Miss Allie Ligon, a neighbor, were
at home when he came. Miss Ligon soon left for her
home. Defendant accompanied her to her horse, and
assisted her to mount, and then went about one hun-
dred yards west to open the gate to the public road, to
let her out. He then returned to the house and his
sister requested him to go with her to Mrs. Morrow's,
whither she was going so as to enable Mr. Morrow to
attend a lodge meeting in Liberty that evening. His
mother said to them, "come, children, do up your
night's work." Defendant said to his sister, "you
help me milk and I will go around that way with you
as I am going to Ligon's." They finished their work,
ate supper and defendant saddled the horses, and he
and Amelia rode over to Mr. Morrow's, and he left her
there and proceeded to Ligon's, a distance of two
miles. Defendant rode a black horse which belonged
to his sister Fannie, who cautioned him to ride slow,
and he and his sister Amelia rode in a walk to Mor-
row's. Defendant remained at Mr. Ligon's about an
hour and a half. He went in a walk going over there
from Morrow's. As defendant came out of Mr. Ligon's,
he stopped at the stile and talked twenty or thirty
minutes with Emmett Ligon, a son of Mr. Ligon.
The testimony tends to show that while at Ligon's
defendant sat in a position which enabled him to see
the clock. Ligon testified he had never known defend-
ant to leave so early as he did that night. He usually
sat until half past ten. As already said Mr. Ligon had
an unmarried daughter, a young lady at that time.
When defendant left Ligon's he went down the main

road in the direction of his home until he reached Mr. Ross' gate, where he went in and rode through four gates to his home.  The purpose of noticing in detail the distances and stops of defendant that evening, is to locate his whereabouts at the time the shots were fired which killed his mother, the contention of the State being that if he reached Ligon's at seven o'clock, and stayed an hour and a half, and then occupied thirty minutes in going home, he reached there at or about nine o'clock.  Various witnesses, neighbors of the Foley's, testified they heard the shots and screams of women either a few minutes before or a few minutes after nine o'clock, whereas defendant introduced witnesses who testified to hearing the shots nearly an hour before the nine o'clock whistle was sounded in Kansas City, a signal easily heard and understood in that neighborhood.  Defendant testified that he rode home in a walk from Ligon's that night, went to the barn, found the east barn gate open, the mules out, stable door open, horse out and saddle gone out of the barn. He went to the house to tell his mother and sisters the horse was gone; found the doors open, called to them, but no one answered.  He went into his mother's room and struck a match and discovered the bed torn to pieces and bloody, and his mother and sister Fannie murdered.  Without touching their bodies he says he rode horseback in a run to Mr, Morrow's, his brother-in-law, three quarters of a mile, and reached there in about three or four minutes.  He then hurried to the residence of Mr. Williams, one and one half miles from Morrow's, and reached there a few minutes after ten o'clock.  He only remained at Morrow's a few minutes.

Defendant belonged to a detective association, and on the day of sale he met a member of the order and asked him if a guard would be kept that night over a certain graveyard, known as the Little Shoal graveyard,

three quarters of a mile from defendant's home. He was informed not. It seems this association had been, shortly before this, guarding this graveyard for several nights. Defendant made two inquiries this day about this guarding of the graveyard. The defendant borrowed a pistol of Bob Williams, a son of his neighbor, Jaret Williams, a few days before the killing. The pistol he borrowed was found in his room that night of the murder with three chambers empty, and two yet loaded, and defendant and young Williams each swore Williams had loaded the pistol when it was loaned the defendant. The defendant stated at one time after the homicide he had shot at a rabbit three times on *Saturday* before the killing, and afterward said he had shot at the rabbit *Monday* evening before the killing.

The evidence tended to show that the defendant had stated in September previous, to one Baker, who worked for James Morrow, the defendant's brother-in-law, while riding to town, that he had loaned a fine saddle horse to a certain young lady in the neighborhood to ride to Liberty to school, and that this would help him in winning the girl; also that his mother and sister Fannie had bossed the place since his father died, but that he proposed to boss it next year, or *the hearse would have to be called to their home.* The evidence showed that defendant also stated in this talk that he expected to marry this girl soon, and take her home. The defendant denied this conversation in his testimony.

On the morning after the murder, while going by the dam on the pond, from the house to the barn to milk, defendant stopped and looked in the pond, and said to his brother-in-law Morrow and his neighbor Ross that the fellow or fellows who committed that murder might have thrown the pocketbooks of his sister and mother, three in number, which were missing, into the

pond.   Afterward the pond was dragged and the three pocketbooks were found in it.   He had stated the night before that one of the pocketbooks was kept between the ticks of the bed occupied by his mother and Fannie.

The women when found by the neighbors were dead, having been shot several times with a pistol and a shotgun.  The bedding was torn and shot and bloody, and the wall by the bed had great holes shot in it, and the shots in the walls and the beds showed the range of the firing was downward.  The wooden bootjack of defendant was found in the room of the murdered women lying on the floor, with pieces of glass and stains of blood on it.  The glass in the window near the bed occupied by defendant's mother was broken and shattered and the shutters of the window were open.  The hasp of the lock of one of the doors was broken, and a considerable sum of money was left untouched in one of the opened bureau drawers in the room where the homicide was committed.  The defendant kept his shotgun sitting in his own room, behind the door.  This gun was found lying on the bench, away from its accustomed place, and showed, on examination, it had been recently fired.  Empty shells were also found in defendant's room.  The pistol ball taken from the body of the deceased, Elizabeth Foley, was the same in calibre with the pistol balls in the pistol loaned by Williams to the defendant.  The evidence disclosed that there was another pistol owned by the family, of the same calibre, lying in the house at the time of the murder, but it had not been used for some time, and the chambers of it were all loaded.

The defendant at the time of the homicide had his mother's note for $400.

There was evidence showing the defendant swore at his mother and sister at times, but he denied this;

and there was much evidence on the contrary that he treated them kindly. The defendant at first was inclined to assert that one Earl Hoover, who had been sent to the penitentiary for stealing the defendant's horse, had come back and committed the crime out of spite at the defendant, but subsequently defendant ceased to make this charge. It was shown that on the night of the murder Hoover was on a farm near Princeton, Illinois. There was testimony that after he was put in jail he said, to witness Land and Ross, that he would produce the man or men in due time who had committed the murder. He denied he ever made this statement to these men.

The morning after the shooting, and the night of the shooting, defendant talked repeatedly about other crimes committed in the neighborhood that had not been discovered, and repeatedly said he did not believe that this crime would ever be discovered. Baker also testified that defendant told him that his share of the · estate upon his mother's death would be $2,000. A cockle-burr was found in the bloody bed clothes with horse hairs on it of the same color and appearance of the hair of the horse defendant rode the night of the murder. The evidence failed to disclose the presence of any person or persons about the Foley premises other than the members of the family and no suspicion seems to have pointed to any person other than that expressed by defendant in regard to Hoover.

Various errors are assigned for a reversal of the judgment of the circuit court.

I. Among the rights asserted by the people of Missouri in framing their organic law, the right in criminal prosecutions to ''a speedy public trial by an impartial jury of the county,'' is rightly considered of inestimable value. When therefore one convicted of

crime insists that he has been denied this privilege it
challenges our closest scrutiny.   It is the settled law
of this State that the defendant in a criminal case is
entitled to a full panel of qualified jurors before he is
required to make his peremptory challenges; hence on
an indictment of murder in the first degree unless the
prosecuting attorney elects to prosecute for a lower
grade of homicide than murder in the first degree, the
defendant is entitled to a panel of forty qualified or
impartial jurors.   *State v. McCarron*, 51 Mo. 27; *State
v. Waters*, 62 Mo. 196; *State v. Davis*, 66 Mo. 684.
By our statutes, section 4197, Revised Statutes 1889,
it is provided that "it shall be a good cause of
challenge to a juror that he has formed or delivered
an opinion on the issue, or any material fact to
be tried, but if it appear such opinion is founded only
on rumor and newspaper reports, and not such as to
prejudice or bias the mind of the juror, he may be
sworn."   Challenges are required to be tried by the
court on the oath of the person challenged or on other
evidence and before the jury is sworn, if the cause of
challenge is discovered before the jury is sworn.
R. S. 1889, sec. 4198.

Among other jurors challenged by the defendant
was James A. James.   On his *voir dire* Mr. James was
asked if he had formed an opinion as to the guilt or
innocence of the defendant and he replied that he had;
that it was formed from neighborhood talk, but that
he could discard that opinion and give defendant a
fair trial.   On cross-examination he was asked if he
still retained that opinion and he answered that he
did; that he was at the first trial of defendant and
heard some but not all of the evidence.   He was
asked if he had talked with the witnesses and he
answered that he had with one witness.   Thereupon
he was challenged as incompetent by the defendant,

but the challenge was overruled and defendant excepted at the time. Another juror, Mr. John W. Lacey, upon his *voir dire* examination stated he had an opinion; that he was present at the first trial of defendant in this charge; had read the *Advance*, a newspaper published in Liberty. Had discussed the question of defendant's guilt with his neighbors and had formed and expressed a positive opinion and still retained it, but according to the way he looked at it he could give defendant a fair trial. This juror was likewise challenged but accepted. These jurors and others testified they had read the evidence reported in the Liberty *Tribune*, whose editor, Mr. Gilmer, testified that he had published substantially all the evidence in the case. Upon this state of facts the competency of the challenged jurors depends. Waiving for the present the competency of those whose opinion was based entirely upon the report of the former trial made by the newspapers in Liberty, we must respond to the competency or incompetency of those jurors who answered that they attended the first trial, heard sworn evidence in the case and discussed the case with a witness in the case. Certain rules of practice in the selection of jurors have long prevailed in this State, and have received the sanction of the courts and approbation of the bar. If a person has formed or expressed an opinion upon his own knowledge of the facts in the case, or from conversing with the witnesses in the case, or read the sworn evidence taken before the coroner on preliminary examination, or if his opinion has been engendered by hearing the witnesses testify under oath in a former trial of the same case, the uniform practice has been to reject such a person as incompetent to serve as a juror. An opinion formed under either of the conditions just named disqualifies him to act as impartial juror however much he may asseverate his ability to render an

impartial verdict.    The law will not under such circum-
stances permit him to judge of his own disinterested-
ness.    An opinion thus formed does not fall within the
exception to the statute as one based merely upon
rumor or newspaper reports, but is strictly within the
rule of exclusion prescribed by the statute, which
declares it a good cause of challenge if he has formed
or expressed an opinion on the issue or any material
fact to be tried.    Men who have thus formed opinions
are just as ready to declare their ability to discard them
and render a verdict solely upon the evidence as those
who have read only newspaper reports, but experience
has taught the danger of confiding to them the issues
of life or liberty.    While this court has sanctioned the
practice of allowing the fullest investigation to ascer-
tain whether an opinion formed from mere rumor or
newspaper reports is such as to create a bias or preju-
dice, it has unqualifiedly pronounced as incompetent
"a venireman who has formed an opinion, either from
his own knowledge, or from conversing with wit-
nesses to the transaction or from having heard their
testimony on a trial of the cause."    *State v. Walton*, 74
Mo. 284.    Indeed many courts of last resort hold that
if a venireman has formed or expressed an opinion
from hearing a witness detail the testimony as given
before the coroner or on a former trial, he is incompe-
tent.    *State v. Culler*, 82 Mo. 623.    As said by this
court in the last cited case, "the rule of the statute
then is the absolute disqualification of everyone offered
for a juror who has formed or expressed an opinion
on the issue; the exception is where such opinion is
founded only on rumor or newspaper reports, and even
the exception has no operative effect if they have been
such as to prejudice or bias his mind."    In *State v.
Hultz*, 106 Mo. 41, this court held that a juror who
stated on his *voir dire* that he had heard the evidence

on the preliminary trial and read a report of the evidence in a local newspaper and formed an opinion therefrom, was incompetent. *State v. Robinson*, 117 Mo. 649. In the light of these cases and the uniform practice, can it be questioned that these jurors, who had listened for a day to the sworn testimony of the witnesses in open court, and who had conversed with a witness and formed their opinion from knowledge thus acquired and the newspaper reports, were not competent to act as impartial jurors? To declare that they were would be to ignore all the precedents and safeguards adopted on the part of the State to insure one charged with crime a fair and impartial trial. We think upon the facts developed to the court upon its own inquiry the jurors Carson, James and Lacey, were clearly incompetent because they each testified they were present at the first trial, heard the evidence, and one of them talked with a witness, and they formed opinions therefrom as to the guilt of defendant and one of them testified he had a very *positive* opinion when he heard the evidence, and still retained it, but would discard it if selected as a juror. We think this constituted reversible error.

II. One of the exceptions of the defendant is of more than ordinary significance and importance. It is charged that under the guise of proving certain admissions of defendant tending to establish his guilt, the prosecution was wrongfully permitted to inject a speech of the witness Land and his conclusions before the jury, over the protest of defendant. To a proper appreciation of this point nothing less than the whole history of the circumstances out of which the controverted statement originated and the statement itself will suffice. The conversation of Mr. Land with the prisoner occurred in January, 1897, after the homicide in November previous. The defendant was in jail in

Liberty awaiting the action of the grand jury. Mr. Land and George Talbott were near neighbors of the prisoner. They met by chance in the sheriff's office, and Land proposed to Cave, the deputy sheriff, that they go in and see the defendant, the jail being connected with the courthouse. Cave gave his consent, but Talbott said he wouldn't go in the jail, but if they would bring the defendant into the sheriff's office he would like to see him. Cave said he would do that if they would be responsible for him, but they declined to do that, so he then said he would bring him into the petit jury room of the courthouse and he would lock them in there, that is to say Land, Talbott and defendant, and thereupon the defendant was brought into the jury room without being consulted as to his wishes and was locked in there with Land and Talbott. Left alone the defendant did not open the conversation. After some preliminaries, the defendant said to them that he didn't know the motive of their coming. When asked how defendant came to say that, Mr. Land says: "When there was something said about the murder he (the prisoner) then said *he wouldn't discuss his case.* I told him I didn't ask him to discuss it. He said he didn't know our motive in coming, as we hadn't come any sooner to see him. 'I told him our motive was as I had been one of the coroner's jury that held him for the murder of his sister and mother, I wished to see him and tell him we were sorry to hold him, but were compelled to do so.' He said, 'I understand that you believe with all your heart that I committed the murder.' I told him I did as sure as I was sitting on the bench, and he said 'I think all the more of you for saying so.' About that time Talbott asked him if he suspicioned any one but Hoover." At this point defendant by his counsel moved that this answer of the witness be stricken out of the record because wholly

irrelevant and irresponsive to the question propounded, and merely the opinion of the witness injected into the case, and improper. The court overruled this motion of defendant to strike out the opinion of Mr. Land, and defendant at the time duly excepted. Under the ruling of the court and by its permission, the witness then proceeded to detail the so-called conversation along the same line as follows: "Mr. Talbott said, Billy do you still suspicion Hoover? He said he did not, and he said, Do you suspicion any one outside of Hoover? And he said, Yes; I have strong suspicions. Mr. Talbott says, Don't you think you ought to tell us who you suspicion? *'And I insisted on that, too.* I told him everybody in the county was ready to come to him, told him they didn't want him to lay there in jail if he was innocent, and would help him out. He said he would at the proper time. *I told him now was the accepted time,'* and Mr. Talbott asked him when was the proper time, and he said the people would not be satisfied until the grand jury returned a bill against him, and then he would tell us. I says: 'Billy, can you furnish evidence against this party you suspicion so strong?' He says: 'I can furnish sufficient evidence to make you and every one else give me the hand of fellowship.' And he says: 'You will do it, won't you?' We both told him we would be glad to do so. I says: *'Billy, according to your statement of the time you left Ligon's, and the route you took, the gait you rode, the distance you had to travel, the time you said you occupied at the house after you arrived that night, coupled with the time of the shooting and the circumstance surrounding the murder, is satisfactory evidence to me that you were there.'* I says: 'you heard no shots. Now, what were you doing?' He says: *'No I heard no shots, but I don't know what time I left there.'* I says: *'You said it couldn't have been later than eight twenty. Yes, I didn't say I*

*knew that but I thought so.'* I told him that then he *was satisfied of that. He says: 'I don't know; it might have been nine o'clock when I left there.' I says: 'No, that couldn't be, for* you couldn't have taken the route you did, traveled the gait you did, opened the gates, taken the time you did to the house, and arrived at Mr. Morrow's at twenty minutes of ten, the time he said you came there.' *To that defendant made no reply.*" Defendant, during that meeting, said to witness Land: " 'You say you believe with all your heart I am guilty.' I said 'Yes.' He said, 'What was the motive?' I says, 'I can't conceive what would prompt a man to murder two defenseless women, much less his mother and sister.' But, I says, 'I believe if you needed $50 and that laid behind your mother and sister, you would have murdered them for that amount of money. The amount would have been no inducement.' " To this speech defendant "did not say anything."

Defendant again moved the court to strike out this statement of witness Land as improper and incompetent for the reason that it was not a conversation between Land and defendant as called for by the question, *but was an argument* on the part of witness Land, and was merely *an expression of his opinion* in reference to the guilt of the defendant on trial, and was calculated to prejudice the defendant's case before the jury and the defendant at the time *was under arrest and under duress.* Which motion was by the court overruled and defendant duly objected and excepted at the time. It would be difficult to conceive of a stronger case of a witness usurping the functions of a jury in determining the material facts which tended to substantiate the charge in the indictment and drawing the conclusion therefrom than the foregoing presents. The duty of a a witness is to testify to facts within his knowledge, and it is the right of the jury to estimate the value of

his evidence and the facts to which he deposes. When the witness essays to transgress these limitations and enter upon an argument as to the weight of evidence, either his own. or of other witnesses, he goes beyond his true sphere, save in the exceptional cases of experts, and in those cases in which his own observation is made the basis of his opinion when he may express an opinion *after detailing the facts*. In all other cases he must testify to facts and not to his individual opinions. Opinions are not competent at all, if all the facts can be ascertained and made intelligible to the jury, and are such as ordinary men in general are capable of understanding. 7 Am. and Eng. Ency. Law, 493. The matters upon which the witness Land gave his opinion to the jury under the guise of repeating a conversation with the prisoner were neither questions of science, art or skill. Nor was he possessed of any special knowledge which would enable him to draw inferences of the guilt of defendant beyond that possessed by the jury. He was asked to state a conversation with defendant obviously and naturally for the purpose of proving *admissions* made by *defendant*, but by reading his statement it will be seen that notwithstanding the protest of the prisoner who was compelled by his situation to hear him, he proceeded to assure the defendant of his conviction of his guilt, and to sum up by way of argument each and every damaging circumstance tending to show the defendant guilty, and to pour them into the unwilling ears of the prisoner and then repeat that statement to the jury *and to say to the jury that defendant said nothing in reply*, leaving the jury to conclude that because defendant did not discuss these matters with him, or deny his conclusions, it was a tacit admission of his guilt. There was no pretense that these were matters within the knowledge of the witness, but they were

inferences drawn from what the witness assumed had been the testimony of defendant before the coroner. Of course there are cases in which *silence* of a party suspected of crime is evidence against him, but to give such silence the effect of an admission the party must be in a position to explain and it is the settled law of this State that a defendant's silence when charges are judicially made against him or *he is under arrest* can not be shown against him. *State v. Young*, 99 Mo. 666. So that when the witness Land summed up the evidence tending to show defendant's presence at his home at the time of the murder and *defendant made no reply*, the jury were not authorized to regard defendant's failure to reply as any evidence of his guilt or assent to the reasoning of the witness, and the court should have protected him of its own motion, but certainly when the defendant had objected to the witness detailing his discourse to the prisoner before the jury and move the court to take it from the jury, his motion should have been sustained. If, however, it be urged that the objection came too late, we answer it did not for these reasons. In the first place the general inquiry for a *conversation* with defendant gave no intimation or notice whatever that the witness would repeat a speech made by him to defendant, instead of testifying to some admission of the defendant. It is true that a party can not speculate upon evidence which is objectionable upon its face *when offered* and afterwards complain of a refusal to reject it later in the trial. *Maxwell v. Railroad*, 85 Mo. 95; *State v. Hope*, 100 Mo. 347; *Hickman v. Green*, 123 Mo. 165; *State v. Marcks*, 140 Mo. 656. But the reason ceasing, the rule itself must cease. When, therefore, the form of the question gives no intimation of the irrelevant and incompetent answer which the witness makes, it would be hard indeed if the defendant moves the court to

exclude it as soon as made aware of its incompetency if he should be met with the reply that he should have objected to it beforehand. The law does not require impossibilities, and when it is impossible for the objecting party to anticipate the evidence before it is admitted his only recourse is to move to exclude it and under such circumstances he is not deemed to have invited the illegal evidence. In *Hickman v. Green*, 123 Mo. 165, Mrs. Green was incompetent by reason of Mrs. Hickman's death and this was *apparent when she was offered* as a witness, and no objection was made to her competency, but she was cross-examined at length by attorneys for the Hickman heirs, and it was adjudged that a motion to exclude her evidence came too late because it was apparent at a glance that if Mrs. Green was incompetent, plaintiffs were as well aware of it *before* as *after* she testified. In *State v. Hope*, 100 Mo. 347, the distinction was drawn in these words: "When the legal objection to testimony is *not apparent* from the question that educes it, but is developed later in any way, the omission to object at the time it came *in is no waiver* of the right to have it excluded. It is only when the exceptionable nature of the testimony has become apparent that the failure to object may constitute a waiver of objection." Holding therefore that there was nothing in the question to give notice of the statement made by the witness Land as to his own statements which were in no proper sense a conversation, we think the objection of defendant in the form of his motion to exclude was timely as to the first part of that statement, and should have been sustained, and as it went to the character and kind of testimony it was even made in advance of the largest and most damaging portion of that evidence, and the court erred in not excluding it and in not preventing

the witness proceeding along that line after the protest of defendant.

The expressions of the witness's opinion upon the merits of the case had no connection whatever with the statement of the defendant as to the time he left Ligon's on the night of the murder. This case is clearly distinguishable from one in which incompetent and competent matters are so intermingled they can not be separated. Every admission of the defendant which was relevant and competent could have been elicited without the recital of any portion of Mr. Land's argument. The prejudicial effect of such a statement by a neighbor and citizen of admitted influence is too obvious to be questioned.

III. For the State the court instructed the jury as follows: ''12. If you find, from the evidence, that the defendant murdered Elizabeth Foley, as charged in the indictment, it is your duty to find him guilty, no matter whether any motive for the deed be apparent or not;'' but refused the following asked by defendant: ''No. A. The court instructs the jury that the absence of any probable motive for the commission of the crime charged in the indictment, is a circumstance which must be considered in favor of the defendant.''

The instruction for the State was unquestionably correct, and was approved in *State v. David*, 131 Mo. 380. The only question that can arise on this part of the case is as to the failure of the court to give defendant's instruction as above set out. While perhaps somewhat objectionable in form it was certainly a sufficient request to charge on that subject, if defendant was entitled to an instruction embodying the principle enunciated. We had occasion in *State v. David*, 131 Mo. 380, to consider how far the existence or absence of a motive effected the prosecution of a crime, and we held

that it did not devolve upon the State in any case to prove a motive for the commission of a crime whether the agency of the defendant in the commission of the crime was established by direct or circumstantial evidence, but we held that the fact of a motive or the failure to disclose any motive in a case of purely circumstantial evidence was always an important inquiry, and the subject of legitimate argument. While the absence of a motive is in no sense conclusive of the innocence of the defendant, it was a circumstance in his favor which he was entitled to have the jury weigh in considering his guilt or innocence. As said by the Supreme Court of California in *People v. Ah Fung*, 17 Cal. 377, "This consideration is not a conclusive circumstance, but it is entitled to be considered, and may or may not be of great weight according to the particular circumstances. The prisoner is always entitled to have every circumstance and fact in his favor weighed by the jury and passed upon in their deliberations." When we consider that the court in this case instructed for the State that the failure to show a motive did not affect the guilt of the defendant if otherwise shown to the satisfaction of the jury beyond a reasonable doubt, and thus brought the subject of motive before the jury for their consideration, we think it was its duty to advise the jury of the converse of the proposition, to wit, that it was a circumstance in defendant's favor in a case to be established by circumstantial evidence, *if they found as a fact there was no discernible motive* for the crime with which he was charged. This course was pursued in *State v. David, supra,* and met our approval and has likewise met the approbation of many other courts. *People v. Ah Fung*, 17 Cal. 377; *Clifton v. State*, 73 Ala. 473. In South Carolina, *State v. Coleman*, 20 S. C. 441, the court refused to charge that if the jury believed the defendant had no motive they

must acquit, but instructed the jury that "the absence *of a motive revealed is a circumstance to be duly considered in weighing the question of guilt.*" A similar instruction received the sanction of the Supreme Court of Pennsylvania in *McLain v. Com.*, 99 Pa. St. 86.

Our conclusion is that the court having charged on the subject of motive and given the view which the jury must take from the State's standpoint, common justice and fairness required the court to advise the jury that in a case to be made out by circumstantial evidence, if they believed no motive was shown, it was a circumstance in defendant's favor which they should consider in making up their verdict as to his guilt or innocence.

IV. The point that there is a conflict between the ninth instruction for the State and the seventh for the defendant is not well taken. Unquestionably the jury alone could weigh the testimony introduced to prove good character. This was all the ninth instruction required, but in the seventh for defendant, the court advised the jury how they should regard the previous good character of defendant if proved in cases of this character. It was as highly favorable as the law would admit. Fully impressed with the gravity of the case, we can not regard the errors we have pointed out otherwise than as prejudicial and such as entitle the prisoner to a new trial.

The judgment is reversed and the cause remanded for a new trial. SHERWOOD and BURGESS, JJ., concur.