STATE of Missouri, Plaintiff-Respondent,

v.

Lonnie Lee RICHARDS,
Defendant-Appellant.

No. 36142.

Missouri Court of Appeals,
St. Louis District,
Division Three.

March 2, 1976.

Motion for Rehearing or Transfer
Denied April 13, 1976.

Application to Transfer Denied
June 14, 1976.

Richard Moore, Public Defender, and Melvin G. Franke, Public Defender, 20th Judicial Circuit, Union, for defendant-appellant.

John C. Danforth, Atty. Gen., Preston Dean and Timothy J. Verhagen, Asst. Attys. Gen., Jefferson City, Daniel M. Buescher, Pros. Atty., Union, for plaintiff-respondent.

SIMEONE, Presiding Judge.

Defendant-appellant, Lonnie Lee Richards, was charged, tried and found guilty of the offense of robbery in the first degree. § 560.120. In accordance with the jury verdict he was sentenced by the circuit court of Franklin County to six years in the department of corrections. He appeals. For reasons hereinafter stated, we affirm.

A jury could reasonably find that during the afternoon of January 13, 1973, Franklin Blanton, a farmer and the victim of the alleged offense, was in St. Clair, Missouri, at the "Coon Hound Corral" (sometimes referred to as the "Okay Corral" or the "Ozark Tavern") drinking several beers. He arrived at the tavern at about 3:00 p. m. When he went to the tavern, he had "$20 on me." While there, he "got to talking to Jim Simmons," a friend of appellant, Lonnie Lee Richards, and Robert Lee Branson. Jim Simmons also has a brother—Don. Mr. Blanton indicated to Jim Simmons that he "would like to go to Sullivan," and Jim

Simmons "up and said, 'Well, I think I know a couple guys going up there.'" Mr. Blanton told Jim that he would "give $3" for the ride to Sullivan. According to Mr. Blanton, Jim Simmons then left the tavern, came back a little later and told him the ride was "out there." Mr. Blanton left the tavern; a "blue car with a light vinyl top" was in front; two men were in the car, and he entered the back seat on the passenger side. The car "took off." During the ride, according to Mr. Blanton, no conversation took place. While still in St. Clair, one of the men in the car—a blond—later identified as the appellant-Richards, indicated that he had to go to the rest room, but instead of stopping at a filling station, the car stopped "behind a gray house." The "blond" got out of the car, and Mr. Blanton and the other man waited. They waited "five or ten minutes." The driver pulled around the building and headed down the street. As they approached the intersection of St. Clair and Duckworth, Mr. Blanton saw "him [the appellant] coming out of the house below there. Out of a big white house." The blond got back into the auto, and the three started for Sullivan. On Interstate 44, appellant-Richards indicated that he was "getting sick," so they pulled off to the side. When they did so, the two men, according to Mr. Blanton, "had the guns on me." "[T]hey both turned around facing me. I was in the back seat . . ." The blond had both guns and "throwed the other one to the black headed man [Branson]." One gun looked like "one of these little Dillingers [sic] you can hold in your hand. . . . But the other one looked like a great big barrel staring me in the face." It looked "blue." They told "me, says, 'Shed your coat. Give me your billfold and empty your pockets.'" "They told me, they said, 'Old man, you won't be needing your billfold, the place you're going.' . . . 'Old man, we are going to kill you.'"

The two men took a blue jacket with a fur collar and $18.00. The men handed the wallet back and Mr. Blanton was told, "'Now get out, Old Man.'"

Mr. Blanton walked to his "boss'" home, and the sheriff was called. Eventually, two officers came and they and Mr. Blanton proceeded to the tavern to see if the men were there, but they were not. They then proceeded to the "white house," and while in the house, Mr. Blanton was shown a "school book" from which he identified the "blond"—Lonnie Lee Richards. The next day, Mr. Blanton was called to the sheriff's office and there identified that defendant in a lineup.

Eventually, the appellant was charged for the alleged offense, and trial was held on January 4, 1974.

During the voir dire examination, the prosecutor in addressing the panel stated that:

". . . His Honor indicated briefly that this charge involves an alleged robbery on the 13th day of January, 1973, here in Franklin County. More specifically, it was a robbery of the person of one Franklin Blanton in an area up close to the Trade Winds on I–44. Now, is there anybody here on the panel who has any prior knowledge or information about this particular offense? Anybody remember hearing about it, reading about it or anything of that nature? I will take you, if you don't mind, by rows. Let's see that's Mr.—

JUROR POHLMAN: Pohlman.

[Prosecutor]: Mr. Pohlman. Where was it—without going into any detail, how was it you have personal knowledge of this offense?

JUROR POHLMAN: I know Frank [Blanton] pretty well.

[Prosecutor]: You know Mr. Blanton?

JUROR POHLMAN: Yes.

[Prosecutor]: Has he discussed this case with you on prior occasions?

JUROR POHLMAN: No.

[Prosecutor]: You are just aware of the fact that it did happen? [Emphasis added.]

JUROR POHLMAN: Yeah.

[Prosecutor]: Is that it? And the fact that you know Mr. Blanton, would that in

any way affect your ability to sit here as a fair and impartial juror? In other words would you give any more credibility to Mr. Blanton's testimony than you would any other person's?

JUROR POHLMAN: I wouldn't think so.

[Prosecutor]: In other words you think you could keep an open mind and give Mr. Blanton the same amount of credibility or noncredibility as you would any other witness, depending upon their demeanor and what have you?

JUROR POHLMAN: Yeah."[1]

Defense counsel sought to challenge Juror Pohlman for cause because "he has already committed to the knowledge there was a crime, which is one of the things—which is really the big issue in the case. I think Mr. Pohlman should be disqualified for cause. He's already formed the opinion that there was a crime." The prosecutor then said, "I think he's probably right. I think it was a bad choice of words on my part." The court replied, "Yes, it was but I'm not going to disqualify him." The court thereupon overruled the challenge for cause.

During the trial, Mr. Blanton was interrogated by the prosecutor during his examination in chief as to whether he [Blanton] had been "convicted of the crime of the abominable and detestable crime against nature in 1955." Mr. Blanton admitted that he had been.[2]

On cross-examination, defense counsel desired to go into some detail concerning the "abominable, detestable crime against na-

ture," and objected to the court's ruling limiting "my cross-examination of this man about his conviction on this abominable and detestable crime against nature. . . ." The court did not permit counsel to go into the details. However, in the defendant's case, Mr. Elmer Maschmann, the clerk of the circuit court of Franklin County, was called and permitted to read the information filed against Mr. Blanton, which detailed the offense "against nature." This was permitted, although over the objection of the prosecutor.

James Simmons testified for the state. In effect, he corroborated the testimony of Mr. Blanton relative to the ride to Sullivan, and testified that after his conversation with Blanton, he went down to "Fuzzie Sohn's" tavern to get "Robert [Branson] and them to see if they would take him up there [to Sullivan]." Simmons told them that Blanton said "he would give them $3 to take him up there." Simmons, together with Robert Branson and Lonnie Lee Richards, went back to the "Coon Hound Corral," told Blanton and observed Blanton enter the car.

During the trial the state called the stepfather of the defendant—Mr. Melvin Greeley, who lived in the "white house" in St. Clair. He testified that on the evening of the 13th two deputies and Mr. Blanton came to his house. Mr. Blanton looked over some pictures in a scrapbook, and after being asked some questions, Mr. Greeley went to the kitchen and "checked to see if my camping—little blank pistol and a pellet BB pistol were in the cabinet." One was "sort of a blue looking gun." One gun

---

1. Two other veniremen—Carr and Klauser—knew Mr. Blanton. Juror Carr indicated he knew "Frank." The prosecutor asked him, "And how is it that you know about this particular incident, sir?" The juror answered, "Just conversation, overhearing conversations." The juror indicated that the fact he knew Mr. Blanton would not affect his ability to sit as a fair and impartial juror. Juror Klauser indicated he knew Mr. Blanton, and "I do remember the circumstances . . . ."

2. During the voir dire examination of the prospective jurors, the prosecutor indicated that

he expected there would be evidence that Mr. Blanton had been previously convicted of the crime of "sodomy," in 1955. The defense counsel objected to the word, since "[t]hat isn't the name of the crime, Your Honor." The prosecutor was then told by the court to "[c]orrect yourself with the jury."

The "sodomy" statute has been held constitutional in Missouri. State v. Crawford, 478 S.W.2d 314 (Mo.1972), appeal dismissed 409 U.S. 811, 93 S.Ct. 176, 34 L.Ed.2d 66, reh. den. 409 U.S. 1051, 93 S.Ct. 536, 34 L.Ed.2d 505.

"might have been six inches long or five inches long. And the bigger gun might have been nine inches long or ten inches long." Upon examination, the guns were not there. No objection was made at this time. At the beginning of Mr. Greeley's cross-examination, however defense counsel objected to Mr. Greeley's testimony concerning the missing guns because "it has not been connected with the gun described by the alleged victim as being used by the Defendant and his accomplice."

At first the trial court indicated that the guns had not been "connected," but after the prosecutor reminded the court that Mr. Blanton's testimony indicated the appellant went into the "white house," the court overruled the objection, since "[y]ou [defense counsel] sat there and let him ask all the questions about it. In view of the fact that the Defendant made no objection to the questions and answers at the time they took place I'm going to let that stand."

Two deputies testified for the state— Deputy Sheriff Michael Scott and Deputy Sheriff Roger Bartolo. Deputy Scott testified that he responded to a call on the evening of January 13, to go to the home of Mr. Armstrong (presumably Mr. Blanton's "boss"). He was met by the Armstrongs and Mr. Blanton. After some conversation, the two deputies left with Mr. Blanton and went to locate the two men. They finally went to the Greeley residence. While there, Deputy Scott testified that Mr. Blanton looked at a book containing pictures, and Blanton "selected a picture from a page contained within the book." Deputy Scott saw the picture selected by Blanton—it was that of Lonnie Lee Richards. An arrest order was then put out. The following day, Deputy Scott went to the St. Louis City Jail, where the defendant was being held, and took him into custody and returned to Franklin County. A lineup was held, which Mr. Blanton viewed. Deputy Scott was permitted at trial to testify that Mr. Blanton made an identification of Lonnie Lee Richards after viewing the lineup.

Deputy Bartolo also was permitted to answer a question "whether or not Mr. Blanton identified anyone in that lineup." He answered, "Yes, sir, he did." However, he never indicated who was identified by Blanton.

The defendant's case directly contradicted the testimony of Franklin Blanton. The theory of the defense was that no robbery was committed, no guns were used, no force was threatened. The theory was that after defendant-Richards, Branson and Blanton arrived in Sullivan, Blanton gave them only $2.00 for the ride when he had promised $3.00, so if he didn't give the other dollar "we would just turn right around and take him back to St. Clair where we found him and just go on about our business. So he did give the other dollar."

Robert Lee Branson testified that he was at "Fuzzie's" drinking with Lonnie and Don Simmons when Jim Simmons came to him and asked him if he wanted to take a man to Sullivan. He did not want to do so but walked to the "Okay Corral" [Coon Hound] and talked to "the guy." He had a beer with Jim Simmons and Blanton. Finally, Branson agreed and went back to get the car. Branson also said that Blanton would give him $3.00 to take him to Sullivan. When they got to Sullivan, Blanton only gave them $2.00, and Branson requested the other dollar and said if he didn't get it he would "turn right around and take him back to St. Clair . . . ." He denied having any guns, denied threatening Blanton with a gun and denied taking any money except the $3.00. He also denied stopping at any time on the way to Sullivan, and claimed they never stopped at the "white house." [3] Throughout the defense, it was brought out the Blanton had a "bad reputation for getting people arrested."

The appellant-Richards also testified that on that January 13, he was in "Fuzzie's"

3. Lonnie Lee Richards testified, however, that they did stop at Mr. Greeley's house and that Branson "was wrong" on this score.

tavern drinking with Don and Jim Simmons and Branson. Jim took off, went to the "Ozarks" and came back. He and Branson left again. When they returned, "we went over to the Ozark Tavern and went in." There was a conversation about taking Blanton to Sullivan for $3.00. They got into the car and stopped at the Greeley house. When they arrived in Sullivan, Blanton was only going to give the $2.00, and "we told him we wanted the other one." Blanton then did give them the other dollar. The appellant also denied the robbery, denied taking any money other than $3.00 and denied pointing a gun at Blanton.

After the court instructed the jury, the jury retired and returned a verdict of guilty of the offense of robbery in the first degree.

In due time, a motion for new trial was filed on the grounds that (1) the court should have sustained counsel's challenge for cause to Juror Pohlman, and (2) the court erred in restricting the cross-examination of Blanton as to the "abominable crime" in not permitting cross-examination as to the "nature and circumstances of the crimes for which he was convicted . . ." No point was raised in the motion relating to the testimony of Mr. Greeley or the testimony of the deputy sheriffs relating to Mr. Blanton's identifying the appellant from the "picture book" or at the lineup.

After the motion was overruled, the defendant was sentenced in accordance with the jury verdict and this appeal followed.

On appeal, appellant contends that the court erred (1) in refusing to sustain defendant's challenge for cause as to Juror Pohlman because he indicated "he was aware of the fact that the robbery did happen," which was a "material issue actually tried," and had "formed" and "delivered" an opinion on this "material fact to be tried," it not being shown that this "opinion" was founded only on "rumor and newspaper reports," § 546.150;[4] and (2) in violating § 491.050[5] by not permitting appellant to impeach Blanton by showing the "nature and circumstances" of the "detestable offense."

The appellant further contends that the court committed "plain error" in failing to strike the testimony of Mr. Greeley concerning the guns missing from his home and in failing to strike the testimony of the Deputy Sheriffs Scott and Bartolo that Blanton identified the defendant from a picture and identified the defendant at the lineup.

As to the principal point concerning the challenge of the venireman for cause, appellant vigorously argues that "it is clear that juror Pohlman had formed and delivered an opinion that a robbery had happened, and that opinion was not founded on rumor or newspaper reports; and it was on the most material fact of all—whether or not a robbery really did happen." "Clearly," he says, "Juror Pohlman should have been disqualified under the statute. . . . The failure of the judge to disqualify, Pohlman for cause, denied the defendant his right to a full panel of qualified jurors before he was required to make his peremptory challenges. The judge violated the mandatory terms of the statute to the defendant's prejudice. . . ."[6]

The principal issue to be determined on this appeal, as appellant's counsel frankly

4. § 546.150 provides: "It shall be a good cause of challenge to a juror that he has formed or delivered an opinion on the issue, or any material fact to be tried, but if it appear that such opinion if founded only on rumor and newspaper reports, and not such as to prejudice or bias the mind of the juror, he may be sworn."

5. § 491.050 provides: "Any person who has been convicted of a criminal offense is, notwithstanding, a competent witness; but the conviction may be proved to affect his credibility, either by the record or by his own cross-examination, upon which he must answer any question relevant to that inquiry, and the party cross-examining shall not be concluded by his answer."

6. The record does not indicate whether Juror Pohlman served on the jury. On oral argument, defense counsel argued that our recent decision, State v. Simpson, 529 S.W.2d 19 (Mo. App.1975), was erroneous and conflicts with other decisions. There the record revealed that the juror in question did not serve, but the record failed to reveal who used the perempto-

admits, is whether the court erred in failing to strike Juror Pohlman for cause when he indicated that he was "aware" of the "fact that it did happen." Appellant argues that this indicates that Juror Pohlman had formed and delivered an opinion on a "material fact" to be tried—i. e., whether in fact a robbery had occurred, and having formed such an opinion, it not being shown that such opinion was founded only on "rumor and newspaper reports," it was error not to strike the venireman.

This whole matter of "opinion" and preconceived notions about "the issue" "or any material fact to be tried" as disqualifying a prospective juror has been the subject of innumerable decisions since the formation of the jury system. There are several and well-known general principles relating to the matter of disqualification when a juror has formed an "opinion" in the cause.

■ First, and as a general proposition, the foundation of our system is that a cause is to be tried by individuals who are free from partiality or bias for or against the litigants, and " '. . . a juror [should] come to the consideration of the case unaffected by any previous judgment, opinion or bias, either as respects the parties or the subject matter in controversy' . . . ." 47 Am.Jur., Jury, § 294, p. 872 (1969); see also State v. Holliman, supra, 529 S.W.2d at 943.

■ Second, the decision of the trial court is reversible only for an abuse of discretion, and all doubts should be resolved in favor of the finding of the trial court. State v. Wilson, 436 S.W.2d 633, 637 (Mo.

1969); State v. Cuckovich, 485 S.W.2d 16, 22 (Mo. banc 1972).

"[I]t is well established in this state that the trial court 'has a wide discretion in determining the qualifications of a venireman and its decision thereon should not be disturbed except for a clear abuse of discretion. . . . A determination by the trial judge of the qualifications of a venireman necessarily involves a judgment based on the observation of the demeanor of the venireman and, in the light of that observation, an evaluation and interpretation of his answers as they relate to whether he would be fair and impartial if chosen as a juror. The trial judge is in a far better position to make that determination than are we from the cold record.' State v. Harris, Mo.Sup., 425 S.W.2d 148, 155." State v. Cuckovich, supra, 485 S.W.2d at 22–23.

See also State v. Holliman, supra, 529 S.W.2d at 939.

■ Third, Missouri has consistently followed the rule that a defendant is entitled to a full panel of qualified jurors before he is required to make his peremptory challenges. State v. Cuckovich, supra, 485 S.W.2d at 22; State v. Kirkpatrick, 428 S.W.2d 513, 516 (Mo.1968); State v. Lovell, 506 S.W.2d 441, 443 (Mo. banc 1974); State v. Land, 478 S.W.2d 290, 292 (Mo.1972).[7]

■ Fourth, the statute, § 546.150, is not an absolute prohibition. It is based on the Territorial Laws of Missouri Act of January 21, 1816—1 Territorial Laws, § 7, p. 447. The statute must be construed by the innumerable judicial decisions interpreting it. Many satellite issues are involved as to whether a juror must be struck for cause—

ry challenge to remove him. We held that where the record does not reveal that the defendant used a peremptory challenge and there is no proof that the state did not peremptorily challenge the venireman, there is no error. "It is the responsibility of the trial counsel to preserve for appeal a proper record . . . ." 529 S.W.2d at 21. In effect, we held that if there is no showing that the defendant had to use a peremptory challenge, there is no error. Cf. Butler v. Talge, 516 S.W.2d 824 (Mo.App.

1974); State v. Holliman, 529 S.W.2d 932 (Mo. App.1975), and cases cited therein.

7. It is not necessary in this case to decide the question whether defendant may complain where the record does not indicate who had to use a peremptory challenge. Since we hold that there was no error in refusing to strike the juror for cause under the circumstances, it is not necessary to reach this secondary issue. Cf. State v. Simpson, supra.

how was the "opinion"[8] formed, how strong was the "opinion,"[9] whether the opinion, even though formed, may be overcome by expressions that the juror is able to render a fair and impartial verdict and whether he can lay aside any "opinion" and render a fair verdict; was the opinion formed from "rumor" or conversation with the parties or witnesses, or from "newspaper reports" or from personal knowledge or from testimony in a former proceeding. All of these satellite issues are involved before it can be said that a trial court abused its discretion so that we are required to overturn the ruling.

Fifth, the rules in the selection of prospective jurors as to whether they are disqualified under the statute have been often stated. One of the best statements is that of Gantt, P. J. in *State v. Foley*, 144 Mo. 600, 46 S.W. 733, 736 (1898).

". . . Certain rules of practice in the selection of jurors have long prevailed in this state, and have received the sanction of the courts and approbation of the bar. If a person has formed or expressed an opinion *upon his own knowledge* of the facts in the case, or from conversing with the *witnesses,* or read the sworn evidence taken before the coroner on preliminary examination in the case, or if his opinion has been engendered by hearing the witnesses testify under oath in a former trial of the same case, the uniform practice has been to reject such a person as incompetent to serve as a juror. . . . An opinion *thus* formed does not fall within the exception to the statute as one based upon rumor *or* newspaper reports. . . As said by this court in [*State v. Culler*, 82 Mo. 623 (1884)]: 'The rule of the statute, then, is the absolute disqualification of every one offered for a juror who has formed or expressed an opinion on the issue. The exception is where such an opinion is founded only on rumor *or* newspaper reports, and even the exception has no operative effect if they have been such as to prejudice or bias the mind.' " *State v. Foley,* supra, 46 S.W. at 736.[10] (Emphasis added.)

Numerous decisions hold that there is no incompetency under the statute even though a venireman has formed an opinion as to the *guilt* of the accused founded on rumor *or* conversations if he can lay aside such opinion and render an impartial verdict.

"The test of the disqualification of a juror, based on an opinion of the defendant's guilt formed from rumor or from reading newspaper reports, is whether or not he can lay aside such opinion and render a fair and impartial verdict, based solely on a consideration of the evidence under the instructions of the court." *State v. Baker,* 285 S.W. 416, 418 (Mo.1926).[11]

8. What is an "opinion" in the strict legal sense? The average juror is not usually skilled in the niceties of language, and he frequently means he has an "impression." See discussion by Sherwood, J. in *State v. Taylor,* 134 Mo. 109, 35 S.W. 92, 99 (1896), and Comment, Williamson, An Opinion on the Issue, 21 J. of Mo.Bar 118 (1965).

9. The words of Chief Justice Marshall are significant: "Light impressions, which may fairly be presumed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of the testimony, constitute no sufficient objection to a juror; but . . . those strong and deep impressions which close the mind against the testimony that may be offered in opposition to them, which will combat that testimony and resist its force, do constitute a sufficient objection to him." Quoted in *Reynolds v. United States,* 98 U.S. 145, 155, 25 L.Ed. 244, 246 (1878). It is usually said the opinion must be "fixed."

10. Appellant relies on this case to support his point that Juror Pohlman should have been stricken. In the *Foley* case, the jurors listened to a former trial and conversed with the witnesses. The court held that the trial court erred in not striking these prosecutive jurors. Appellant also relies on *State v. Hultz,* 106 Mo. 41, 16 S.W. 940 (1891), but there the juror formed an opinion from evidence he heard at a preliminary trial.

11. *State v. Poor,* 286 Mo. 644, 228 S.W. 810 (1921)—newspaper reports; *State v. Rasco,* 239 Mo. 535, 144 S.W. 449 (1912)—opinion as to guilt—opinions not based on facts elicited from witnesses or any person who professed to know facts; *State v. Lewis,* 323 Mo. 1070, 20 S.W.2d 529, 535 (1929)—juror expressed opin-

Tested within the legal principles established by a long list of precedents, we cannot conclude that the trial court erred in failing to sustain the challenge for cause to Juror Pohlman. The prosecutor asked the panel whether there was anyone who had prior knowledge or information about this offense, and when Juror Pohlman raised his hand, the prosecutor asked, "how was it you have personal knowledge of this particular offense?" His reply was, "I know Frank pretty well." Juror Pohlman had not discussed the case with Frank Blanton, but when asked, "You are just aware of the fact that it did happen," he replied, "Yeah."

We are not convinced, as appellant argues, that, by the statement that he was "aware" of the fact "it" did happen, Mr. Pohlman formed an "opinion" that in fact a robbery with all its constitutive elements had occurred. To be "aware" that "it" did happen does not necessarily mean that an "opinion" had been formed that the robbery did in fact occur.[12]

But, taking the argument of the appellant that by these words Mr. Pohlman did form an opinion as to the fact that a robbery did indeed occur, still we cannot say that the trial court erred in failing to strike Juror Pohlman for cause.[13] Mr. Pohlman did not speak to Frank Blanton about the case, there is nothing in the record to indicate that he talked to any witness; the only basis for concluding that he formed an "opinion" is that he knew Frank Blanton "pretty well." Therefore, the implication is

that his "opinion" may well have been formed by conversations or rumors or merely because he knew the victim, which, under the authorities, do not rise to a disqualification as a matter of law.

The tests laid down in all the authorities above indicate that a juror is not, under the statute relied upon, incompetent merely because he has formed an opinion "on the issue" or as to any "material fact," but such a determination depends on whether that fixed opinion is formed or expressed (1) by hearing a substantial amount of testimony in a previous proceeding; (2) by speaking to witnesses in the case; or (3) from facts based on his personal knowledge. See Brill, Voir Dire I, supra, 29 Mo.L.Rev. at 291. None of these situations existed here. Furthermore, he indicated upon interrogation that the fact that he knew Frank Blanton would not affect his ability to be a fair and impartial juror. He indicated upon questioning that he could give a fair and impartial trial. Under these circumstances, we conclude that the trial court did not err.

Appellant takes a too simplistic view of the statute. He argues in effect that the mere fact an opinion is formed as to a "material fact" requires that the prospective juror must be disqualified. The authorities do not bear this out. We rule this point against appellant.

Next, appellant complains that the court erred in limiting the cross-exami-

ion on way to attend court that jury would convict not incompetent when he stated on voir dire he had not formed opinion on guilt; *State v. Welsor*, 117 Mo. 570, 21 S.W. 443, 445 (1893) —aversion to a plea of insanity does not disqualify juror, even though fact to be tried, where trial court is satisfied that juror will give fair trial; *State v. Reed*, 89 Mo. 168, 1 S.W. 225 (1886)—juror expressed opinion on guilt based on conversations with wife—not incompetent; see complete discussion in Rosenwald, Exemptions from Jury Service and Challenges for Cause in Missouri, 15 St. Louis L.Rev. 361, 366–381 (1930), and Brill, Voir Dire I—Examination of Jurors, 29 Mo.L.Rev. 259, 291–292 (1964).

12. The fact that a venireman has knowledge that a particular crime has occurred is insufficient to sustain a challenge for cause where there is no showing that a venireman has formed or expressed an opinion as to the guilt of the defendant. *State v. Cashman*, 485 S.W.2d 431, 433 (Mo.1972). And the fact that a venireman is a friend of the victim is not sufficient to disqualify him.

13. Compare: *Yeager v. State*, 43 Okl.Cr. 318, 278 P. 665, 667 (1929)—the fact that a juror formed an opinion that deceased had been murdered and an opinion as to the cause of death did not disqualify juror; and *Mathews v. State*, 19 Okl.Cr. 153, 198 P. 112, 117 (1921) [fraud].

nation of Mr. Blanton by not permitting counsel to go into the details of the "abominable and detestable crime against nature" after Blanton admitted conviction thereof.[14] There was no error in this regard. *State v. Scott*, 459 S.W.2d 321, 323 (Mo.1970). The trial court is permitted a wide discretion in determining the permissible scope of cross-examination especially as to matters of impeachment. *State v. Johnson*, 486 S.W.2d 491, 496 (Mo.1972).

Appellant next contends that the court erred in failing to strike the testimony of Melvin Greeley regarding the guns which were found missing on the day of the robbery because the state did not "connect that testimony up" with the testimony of Franklin Blanton regarding the guns used in the alleged robbery. Appellant admits that this point was not preserved, but argues that we should consider this point under "plain error." Rule 27.20(c).

In order to establish plain error on appeal, appellant has the burden of showing that the error amounted to a "miscarriage of justice" or resulted in "manifest injustice." Rule 27.20(c).

Franklin Blanton testified that he saw the defendant coming out of a "big white house" prior to the robbery. The defendant himself testified that they stopped at the house so that he could use the bathroom after Mr. Blanton was in the car. After the robbery, Mr. Greeley noticed that two guns which he had kept in a cabinet at the house were missing. His description of the two guns substantially matched that given by Mr. Blanton. This evidence, albeit circumstantial, tended to prove that the appellant had access to the missing guns prior to the robbery, and as such, was relevant and material on the issue of whether in fact the robbery had occurred. See *State v. Stancliff*, 467 S.W.2d 26, 30 (Mo.1971). There was no manifest injustice or miscarriage of justice. This point must be ruled against appellant.

Finally, appellant contends that the trial court improperly permitted Deputies Scott and Bartolo to testify concerning Mr. Blanton's extrajudicial identification of the defendant. This point also was not preserved for review, and appellant urges that we consider it as plain error also.

Appellant relies on *State v. Degraffenreid*, 477 S.W.2d 57 (Mo. banc 1972), in support of his contention. In *Degraffenreid* there was only one eyewitness, a 78-year-old man, and the testimony of the officer corroborating the identifying witness could, in the opinion of the court, have tipped the scales against the defendant. The admission of such identifying testimony may or may not be harmless error. We believe *Degraffenreid* is distinguishable and does not control this case. There was no real issue of identification here. Appellant admitted he was in the automobile, and Mr. Blanton previously testified as to his extrajudicial identification of the defendant. Under such circumstances, we find no plain error.

Hence, we conclude that (1) the trial court did not err, under the circumstances here, in failing to strike the venireman for cause; (2) there was no error in limiting the cross-examination of Frank Blanton concerning the details of the "abominable and detestable crime against nature"; and (3) there was no "plain error" in admitting the testimony of Mr. Greeley, and in admitting the testimony of the deputies concerning Mr. Blanton's identification. Rule 27.20(c).

We have reviewed the entire record, we have read the briefs of the parties and the authorities relied upon and conclude that the judgment should be affirmed.

The judgment is affirmed.

KELLY and GUNN, JJ., concur.

---

14. In defendant's case these details were brought out by the circuit clerk by reading