CITY OF ADVANCE, Missouri, at the Relation of Jerry HENLEY, a Minor, by Jim Henley, his Next Friend, Appellant,

v.

MARYLAND CASUALTY COMPANY, a Corporation, and Herbert Westbrook, Respondents.

No. 45616.

Supreme Court of Missouri, Division No. 1.

May 13, 1957.

Briney & Welborn, Bloomfield, for plaintiff-appellant.

Elvis A. Mooney, Bloomfield, C. A. Powell, Dexter, for respondents.

HOLLINGSWORTH, Presiding Judge.

In this action, Jerry Henley, a minor, sought in count one of his petition to recover the sum of $1,000 from Herbert Westbrook, marshal of the City of Advance, Missouri, and his surety, Maryland Casualty Company, for personal injuries sustained during an alleged unlawful assault upon and battery of him by Westbrook. In count two, plaintiff sought recovery of the sum of $10,000 punitive damages from Westbrook alone. Defendants

denied any unlawful assault by Westbrook upon plaintiff and pleaded that at the time alleged in the petition Westbrook had placed plaintiff under arrest "for speeding within the City Limits of the City of Advance", and that Westbrook "used no more force than was reasonably necessary to defend himself after plaintiff first struck and hit [him] and to prevent the plaintiff from escaping from his custody." Plaintiff's reply was a general denial. Trial of the case resulted in a verdict and judgment for defendants, from which plaintiff has appealed, alleging error (1) in the giving of defendants' Instructions D–2 and D–4, (2) in permitting erroneously prejudicial argument on the part of the defendants' counsel, and (3) in excluding evidence offered by plaintiff. Defendants deny the error asserted by plaintiff and take the position that defendants are entitled to a directed verdict.

On the date of the occurrence in issue, December 11, 1954, and for several years prior thereto, Herbert Westbrook was marshal of the City of Advance and Maryland Casualty Company was surety upon his official bond, which was conditioned that he "well and faithfully perform * * * the duties incumbent upon him." Plaintiff, aged 16 years, resided with his parents near the City of Advance and was employed at "Mutt's Place", a restaurant and automobile service station, situate about one-fourth mile outside the city limits. His hours of work were from 7 p. m. to 7 a. m. daily. Plaintiff and Westbrook well knew each other and each knew the residence and the employment of the other.

Plaintiff's testimony was: About the hour of eleven o'clock, p. m., Westbrook came to Mutt's Place in the city police car and said, "Come here, Jerry, I want you", never at any time telling plaintiff he was being arrested. Plaintiff got into Westbrook's car and sat on the front seat to his right and the car "started up". Westbrook asked plaintiff if he remembered "going by" his (Westbrook's) home and passing a woman. Plaintiff replied that he did "go by" Westbrook's home about 6:00 p. m. and did pass a woman. Westbrook said, "You were doing 50 miles an hour when you went by her." Plaintiff said, "Herb, I wasn't." Westbrook drove to the home of the police judge, inside the city limits, and there sounded the horn of his car. The home was dark and as they sat there waiting for the judge, Westbrook continued to insist that plaintiff "was doing 50 miles an hour" and plaintiff insisted to the contrary. Westbrook said, "Shut up or I will knock hell out of you." At that time Westbrook struck plaintiff with the side of his hand and then "come around" with his left hand, striking plaintiff in the mouth, breaking a denture of false teeth and severely injuring his lips and mouth. Plaintiff never at any time touched Westbrook. The police judge came to the car, whereupon Westbrook told him he had "this boy down here for speeding" and that plaintiff "was trying to tell me how to run my business and I had to quieten him down." Plaintiff said, "He broke my teeth", and the judge asked, "What did you hit him with, Herb?" The judge and Westbrook then stood outside the car, conversed privately, and both returned and sat in the car. The judge said "he would make it easy on me * * *, would fine me sixteen and a half". Plaintiff said he wanted to "talk to my dad first", the judge said it was "all right with" him and Westbrook assented. They told him to come back the next day, and Westbrook took plaintiff back to Mutt's Place and then to another place where plaintiff had left his car. Plaintiff had drunk one can of beer after passing Westbrook's home at 6 p. m. and prior to 11 p. m., when Westbrook came after him. He had drunk no other intoxicants that day.

The evidence in behalf of both defendants tended to show: Ordinance No. 28 of the City of Advance made it unlawful to operate an automobile upon the streets of the city in excess of 20 miles an hour. When plaintiff drove past Westbrook's home on the evening of December 11, 1954,

he was going at a speed estimated by Westbrook at 50 miles an hour. Thereafter, at about 10 p. m., Westbrook went to Mutt's Place, called plaintiff to his car, told him to get into it, and told him he "was going to take him to the police judge". Plaintiff asked why he was being taken there. Westbrook asked him if he did not remember going "past my house about 50 miles an hour". Plaintiff said he remembered going by there and that he was going over 20 miles an hour, but he was not going 50 miles an hour. As Westbrook's car got closer to the police judge's home, plaintiff, who was intoxicated, "got louder" and began throwing his arms around. Upon arrival at the judge's home, plaintiff opened the car door and said, "I'm not going to see no police judge, I'm going to get out of here." Westbrook "had to grab [plaintiff's] arms and pull the door back shut to keep him in the car". Westbrook never hit plaintiff and did not know how his false teeth became broken. After the police judge came to the car, plaintiff quieted down and "pretended to take these teeth out of his mouth" and said, "Here are some teeth you broke * * *." The police judge got into the car and the parties talked for about an hour. Westbrook and the police judge did not get out of the car. About four days prior to this occurrence, Westbrook asked plaintiff how many times he had to be warned about the way he had been driving and plaintiff had replied, "Your speed signs here in Advance don't mean anything to us boys around here * * *. By God, you had better not ever arrest me."

Plaintiff contends that Instruction D–2, given at the request of defendants, was erroneous because it did not require the jury to find that Westbrook had plaintiff under "lawful" arrest at the time of the assault. Said instruction directed the jury that if it found plaintiff was "under arrest for speeding within the city limits of the city of Advance in violation of the ordinances" of said city and that defendant Westbrook with reasonable cause believed plaintiff was about to escape and to prevent escape Westbrook used only such force as was reasonably necessary, then the jury would find in favor of both defendants. Not only did defendants' aforesaid Instruction D–2 assume a lawful arrest, but so did their given Instruction D–4, which, in effect, directed the jury that if it believed plaintiff "started or brought on the exchange of physical contacts, * * * and wilfully engaged in the exchange of blows * * and that the defendant Westbrook used no more force than was used by [plaintiff], * * * then your verdict will be for the defendants * * *."

In this court, defendants say that Instruction D–2 "properly did not require the jury to find that the arrest was lawful", because the legality of the arrest was a question of law. They further contend that defendant Maryland Casualty Company is not liable for defendant Westbrook's act and was entitled to a directed verdict if the arrest was unlawful. They also say that Instruction D–4 was proper because "plaintiff's own evidence showed that actually he was under arrest" and that "Westbrook had the right to use as much force as was necessary to defend himself * * *"

The facts as to the arrest are not in dispute: Westbrook saw plaintiff drive an automobile past Westbrook's home in the City of Advance at 6 p. m. Westbrook estimated his speed to be 50 miles per hour. At 10 or 11 o'clock, p. m., Westbrook drove to Mutt's Place beyond the city limits and there, as marshal of the City of Advance, without process, arrested plaintiff for a violation of the "speed" ordinance of that city. Was that arrest lawful? The answer to that question has a most important bearing not only upon this appeal, but, if the cause is remanded, then upon any future trial of the case.

■ It is well established as a general rule that, in the absence of statute, municipal police officers have no official power to apprehend offenders beyond the bound-

aries of their municipality. 4 Am.Jur., Arrest, § 51, p. 35; 6 C.J.S. Arrest § 13, p. 611; State ex rel. McNamee v. Stobie, 194 Mo. 14, 57, 92 S.W. 191, 201; Rodgers v. Schroeder, 220 Mo.App. 575, 287 S.W. 861, 863–864, and cases therein cited. Defendants seemingly concede the rule. They say, however, that Section 85.610 RSMo 1949, V.A.M.S., gave Westbrook the right to make the arrest. That section, defining the powers of marshals of cities of the fourth class, of which class is the City of Advance, provides:

"The marshal in cities of the fourth class shall be chief of police, and shall have power at all times to make or order an arrest, with proper process, for any offense against the laws of the city or of the state, and to keep the offender in the city prison or other proper place to prevent his escape until a trial can be had before the proper officer, unless such offender shall give a good and sufficient bond for his appearance for trial. The marshal shall also have power to make arrests without process, in all cases in which any offenses against the laws of the city or of the state shall be committed in his presence."

■ This section does not empower the marshal to make an arrest beyond the city limits. In the case of Rodgers v. Schroeder, supra, the St. Louis Court of Appeals considered a statute identical in context with the statute here invoked by defendants in connection with the identical question with which we are presently concerned, except that it involved an arrest beyond the city limits for violation of a speed ordinance of a city of the third class.[1] After a careful analysis of the law and numerous decisions, the court declared, 287 S.W. 861, 863–864: "The power of such officers to arrest without process

for mere quasi criminal offenses arising from the violation of ordinances is liable to serious abuses, and ought not to be enlarged by judicial construction beyond what is expressly granted or necessarily implied in the statute. It is clear that our statute does not expressly confer upon the marshal, assistant marshal, or policemen the power to make arrests without process beyond the limits of the city, and we see nothing in the statute from which such power may be implied. * * *

\* \* \* \* \* \*

"We conclude that the defendants were without authority to go beyond the limits of the city of Washington to effectuate the arrest of the plaintiff without process, * * *. We are not concerned here, of course, with the power of marshals, assistant marshals, and police officers of towns and cities to make arrests for felonies."

■ The above case is well reasoned and is supported by the great weight of authority. We hold that the arrest of plaintiff by defendant Westbrook was unlawful.

The next question is whether Westbrook's co-defendant surety is liable for an assault made upon plaintiff in effecting his unlawful arrest and thereafter forcibly restraining him of his liberty.

In support of their contention that the defendant surety is not liable, defendants cite Motley v. Dugan, Mo.App., 191 S.W.2d 979; State ex rel. Brennan v. Dierker, 101 Mo.App. 636, 74 S.W. 153, and State ex rel. and to Use of Kaercher v. Roth, 330 Mo. 105, 49 S.W.2d 109. The first of these cases, Motley v. Dugan, is not even remotely in point. The Dierker case was expressly disapproved in the Roth case; and the Roth case holds directly to the contrary of defendants' contention.

---

[1] As noted in Rodgers v. Schroeder, supra, marshals of cities of the third class for many years have been empowered by statute (Section 85.590 RSMo 1949, V.A.M.S.) to execute writs and process within the limits of the county. In cities of the fourth class, however, they are not empowered to make arrests beyond the city limits even upon process.

The Roth case was an action by Kaercher against Roth, a constable of Central Township, St. Louis County, and his surety, on Roth's official bond. The suit arose out of the arrest of Kaercher without warrant in the City of St. Louis by Roth's deputy, Skow, for a misdemeanor committed by Kaercher in Central Township. The trial court sustained a demurrer to the petition and entered judgment against plaintiffs. Upon appeal the court stated the issue, 49 S.W.2d loc. cit. 110: "Respondents' position is that when Skow crossed the county line * * * his acts immediately ceased to be *virtute officii* and became those of a private citizen; that the acts then were not even *colore officii.*"

■ We said, 49 S.W.2d 109, 110–111: "We cannot subscribe to such a doctrine. * * * If the act was done by virtue of his office or under color of office, then the bondsman, surety company, is liable in damages for the injuries inflicted. If the act can be said to be that of Skow as a private citizen only, then the bondsman is not liable. The test often applied, which has received approval from many of the highest courts of the land and to which we desire to add our approval, is found in 24 R.C.L. 965, § 59. It is as follows: 'The test should be: Would he have acted in the particular instance, if he were not clothed with his official character, or would he have so acted if he were not an officer? If he assumed to act as an officer—whether under valid or void process, or under no process whatever—the bondsmen should be held, as he is held, for they are the sponsors of his integrity as an officer while acting as such.' "

The opinion took note of the contrary ruling in the Dierker case and other cases so holding and agreed with the learned writer of the Dierker case, Judge Goode, that the earlier cases which Judge Goode felt he was obliged to follow were based upon the "overweening tenderness of the law for sureties". The opinion in the Roth case then said, 49 S.W.2d loc. cit. 111–112: "However, this so called tenderness for sureties has no place in the law in cases of sureties for hire. Royal Indemnity Co. v. Northern Ohio Granite & Stone Co., 100 Ohio St. 373, 126 N.E. 405, 12 A.L.R. 378 and annotations at pages 382–390. These sureties receive compensation, and for a valuable consideration bind themselves and guarantee that, in cases of sheriffs or constables, the officers will not abuse the power with which they have been vested. The sureties should be held to their contract.

\* \* \* \* \* \*

" 'Sureties are not needed on a sheriff's bonds, if they are only to be held when he acts legally. They vouch for his acts, and bind themselves to make good any damage he may cause to any one while acting under color of his office.' Since the advent of surety companies, the majority of bonds are signed by sureties for hire. The courts have adopted a different rule and hold sureties for hire to the terms of their bonds."

The judgment of the trial court was reversed and the cause remanded. The Roth case, to the extent above stated,[2] has been consistently followed and is the law in Missouri and generally elsewhere. City of Festus ex rel. and to Use of Stolzer v. Kausler, Mo.App., 105 S.W.2d 646, 649; Maryland Casualty Co. v. Kansas City, 8 Cir., 128 F.2d 998, 1001. See also State of Missouri ex rel. and to Use of De Vault v. Fidelity & Casualty Co., 8 Cir., 107 F.2d 343, 349.

■■ In the instant case it stands admitted and, in effect, was pleaded that defendant Westbrook acted by virtue and under color of his office in arresting plaintiff. It follows that the Maryland Casualty Company is liable under the first

2. The Roth case also held that an officer was not justified in using a deadly weapon in order to arrest a person guilty only of ■ a misdemeanor. That portion of the opinion was disapproved in State v. Ford, 344 Mo. 1219, 130 S.W.2d 635.

count of plaintiff's petition to the extent of the principal thereof for any personal injuries sustained by plaintiff that directly resulted from his unlawful arrest and restraint. It also follows that Instruction D–2 was prejudicially erroneous in assuming that the arrest of plaintiff, shown herein to have been unlawful, authorized defendant Westbrook to use such force as was reasonably necessary to prevent his escape; and that Instruction D–4 was erroneous in assuming plaintiff was under lawful arrest and, therefore, not privileged to resist physical restraint.

■ Plaintiff contends prejudicial error was committed in permitting counsel for defendants to argue that if a verdict were returned against Maryland Casualty Company, Westbrook would have to reimburse the company. The trial court did permit the argument. Defendant says the court did not err in so ruling because the law makes the principal liable over to the surety. The rights and liabilities existing between the parties defendant herein were of no concern whatever to the jury and legally could not be stressed in argument by either of the parties in an effort to obtain a favorable verdict or award of damages. The court erred in permitting the argument.

■ Plaintiff also contends that the court erred in refusing to admit into evidence a certified copy of a judgment of the circuit court of Stoddard County showing plaintiff's acquittal of the "speeding" charge for which he was arrested. The petition in this case alleges neither false imprisonment nor malicious prosecution as the gravamen of plaintiff's cause of action. The first count alleges only that, while acting as marshal, Westbrook "unlawfully and without just cause did strike, beat and wound the said Jerry Henley about the face, mouth and head and other parts of his body", etc.; and, in the second count against Westbrook alone, it is further alleged that said "striking and assault of the plaintiff was wanton and maliciously done

without lawful cause", etc. In such state of the pleadings (the adequacy or effect of which is not otherwise before us), it would seem that the fact of plaintiff's acquittal or conviction of "speeding" is a collateral matter. Plaintiff suggests that the judgment of his acquittal was made competent by the admission, over his objection, of Westbrook's testimony relating to former arrests of plaintiff, "warnings" given him for alleged "speed" violations and a threat allegedly made by plaintiff if Westbrook should attempt to arrest him. We need not here attempt to anticipate what may occur at any future trial. It may be said, however, that, ordinarily, neither party should be permitted to develop those incidents, except to the extent they may become competent to reveal the animus or malice of either belligerent toward the other.

The judgment is reversed and the cause remanded for a new trial in accordance with the views herein expressed.

All concur.