**STATE of Missouri, Respondent,**

v.

**Johnnie W. MESSLEY, Appellant.**

No. 49556.

Supreme Court of Missouri,

Division No. 2.

March 11, 1963.

Rehearing Denied April 8, 1963.

Edward V. Sweeney, Monett, Frieze & Crandall, Carthage, for appellant.

Thomas F. Eagleton, Atty. Gen., William L. Hungate, Sp. Asst. Atty. Gen., Jefferson City, for respondent.

BARRETT, Commissioner.

Johnnie W. Messley, a retired air force sergeant whose hobby is firearms, has been found guilty of assault with malice with a deadly weapon and his punishment fixed at four years' imprisonment. V.A.M.S. § 559.180. Throughout the trial Messley has been represented by experienced and resourceful counsel, therefore it is necessary to note but briefly the circumstances of the shooting and to consider only such assignments of error as have been properly briefed and argued upon this appeal. Sup. Ct. Rule 28.02, V.A.M.R.; State v. Mason, 339 Mo. 874, 98 S.W.2d 574; State v. Reese, 364 Mo. 1221, 274 S.W.2d 304.

Sometime after 11 o'clock and after 8, 10, or 12 beers since 3 o'clock in the afternoon, Johnnie left Sadie Wrobleski's beer tavern in Pierce City, got in his automobile parked in the rear parking lot and proceeded out Commercial Street to its intersection with Highway 60. There, Johnnie says, he stopped for a stop sign, traveled about two miles south on Highway 60 toward his home in Monett. But, realizing that he was being followed by Constable Gasche, he drove on until he came to a side road, turned around and "went back from the way I came," five or six miles into Newton County. Gasche was the constable in Pierce City and had been commissioned deputy sheriff by the Sheriff of Lawrence County. He had stopped Messley on two prior occasions, one of them resulting in his pleading guilty in Lawrence County to a traffic offense involving intoxicants. He had followed him about the streets of Pierce City on 12 or 15 occasions and, according to Johnnie, "I could see that he had it in for me." Gasche says that when Johnnie crossed Commercial street he did not observe the highway stop sign. When Johnnie realized that he was being followed, he "slowed up enough that I could recognize him, why I just drove on; and he didn't follow me, he just slacked off. * * * I hadn't done anything, and he was on my back all the time; and I figured he didn't have no right to stop me when I wasn't doing nothing."

In any event, instead of proceeding on to Monett and home, Johnnie turned his white Cadillac around and Gasche followed for about a mile and a half with his siren sounding and his red police light flashing. He stopped and when Gasche walked up Johnnie inquired what he wanted. Gasche said, "I just want you to set here in the car until the other officers get here." Instead of waiting Johnnie drove off and Gasche followed for five or six miles until, near the Smackout store in Newton County, a Monett police car drove in front of the Cadillac and again it stopped with Gasche's automobile in the rear, all three vehicles headed west. Then, this is Johnnie's version of what followed: "They slowed up and all three cars stopped; and Mr. Gasche got out of his car and he was parked fairly close behind me, and I didn't get out or anything, and he walked up to the side and he had his revolver in his hand; and when he walked up to the side, I figured this was the time, and I shot him, when he walked up with a gun in his hand." He says now that he did not intend to kill Gasche, that he saw the gun and was in fear of his life and "I shot him before he could shoot me." He does not claim that Gasche shot at him and he does not know how many shots he fired from the .25 caliber automatic after he took it out of the glove compartment. On the other hand, this is the contrary version of the shooting, the Monett police did not see a gun in Gasche's hand as he walked up to the Cadillac and Gasche says that he did not have his gun in his hand. He walked up to

Johnnie's automobile and said, "Get out of the car." And then, with no words spoken, "He just laid the gun over right on the door and went to shooting." Three shots were fired from a clip of six shells and they all took effect in Gasche's right side and abdomen as he backed away and fell into a ditch on the south side of the road. Messley "took off at a pretty good rate of speed" and for the first time Gasche drew his gun and fired three times as the automobile drove away. At least one of the Monett police officers also fired at the vanishing vehicle and one bullet struck Johnnie's shoulder. Subsequently, in Mt. Vernon, a highway patrolman and others said that after Johnnie had been arrested someone inquired as to Gasche's condition and Johnnie said "he hoped the son-of-a-bitch died," if he didn't "he would have to do the job over again."

It is not necessary to note the several inferences permissible from these circumstances, upon this appeal the serious objections are to the instructions and the facts are thus detailed in order that the instructions may be considered in context. There is one assignment of error concerned with testimony, more precisely with the refusal of the court to permit a certain line of cross-examination. After the close of the State's case the defendant again called Mr. Gasche and asked several questions designed to show bias or to embarrass if not impeach him. Then defendant's counsel inquired whether it was true that "on a great many occasions you have followed Sadie Wrobleski late at night after she had closed her place up clear out in the county toward her home?" Then counsel inquired if in October 1960 he had not followed Lucy Looney out on Highway 37. The court sustained objections to these questions and then the defendant proposed to call Lucy Looney and prove that on one occasion Gasche had stopped her and had "violently attacked and manhandled" her but offered to let her go "provided he could have his way with her." It is now urged that the court erred in excluding these questions and offers, that it was an improper restriction upon the right of cross-examination and that the proffered evidence was admissible to impeach Gasche.

■ Admittedly, counsel may in good faith ask discrediting questions for the purposes of impeaching the character of a witness. State v. Bagby, 338 Mo. 951, 964, 93 S.W.2d 241, 248. But when, as with the questions involved here, the inquiries relate to collateral matters counsel is bound by the answers and the latitude of such cross-examination is for the most part in the court's discretion. State v. Winn, Mo., 324 S.W. 2d 637. There are several possible distinctions in the cases relied on but they need not be noted, as to extraneous collateral matters it is not permissible to impeach the witness by proof of a contrary fact. Here these two questions were not answered but the court permitted counsel to inquire fully into Gasche's previous arrests of Johnnie, and his following him on various occasions. The defendant was also entitled to ask questions designed to test Gasche's veracity or accuracy and thereby shake his credibility by injuring his character. But there was no manifest prejudicial abuse of discretion in the court's refusing permission "to go into collateral specific incidents, remote from the day of the shooting of deceased." State v. Brotherton, Mo., 266 S.W.2d 712, 715; State v. Hewitt, Mo., 259 S.W. 773, 782; State v. Dees, Mo., 276 S.W.2d 201.

As to instructions, the first objection is to given instruction 11, one of a series of 14 given instructions: "The jury are instructed that the law of self-defense does not imply the right of attack; and if you believe from the evidence, beyond a doubt, that the defendant shot J. Y. Gasche unnecessarily, and when he did not have reasonable cause to believe that J. Y. Gasche was then about to kill him, or to do him some great bodily harm or some personal injury, then there is no self-defense in the case, and you cannot acquit the defendant upon that ground." The objection is to the phrase "that the law of self-defense does not imply the right of attack." Specifically,

it is said that this particular phraseology in the instruction "unduly narrowed, restricted and limited his right of self-defense in view of the testimony surrounding the shooting in question."

■ As the State points out, there were at least two other instructions dealing directly with the subject of self-defense and there is no objection to them. In the first place there was the principal self-defense instruction, number 6, which rather fully hypothesized the appellant's theory. And, in connection with the defendant's apprehension of "great personal injury to himself" there was an instruction as to Gasche's "rash, turbulent and violent disposition." There was an instruction on communicated threats and a delimiting instruction, number 10, on reasonable apprehension of danger. It is not necessary to again carefully distinguish and reconcile the cases, where the right of attack may have been necessary to the right of self-defense the language objected to should not be employed unless clearly qualified by facts, definition and further hypothesization. State v. Williams, 337 Mo. 884, 87 S.W.2d 175, 100 A.L.R. 1503. But instruction 11 does not stand alone (State v. Daugherty, Mo., 196 S.W.2d 627), it is one of a series, and the excerpted language is qualified by a hypothesis to which there is no objection— that Messley shot Gasche unnecessarily and when he did not have reasonable cause to believe that Gasche was about to kill him or do him some great bodily harm. State v. O'Leary, Mo., 44 S.W.2d 50. And from the State's point of view there was an evidentiary basis for that particular factual hypothesis. State v. McCollum, 119 Mo. 469, 24 S.W. 1021, a murder case, but it may have been the case from which instruction 11 was adapted. Strangely enough very few of the instructions on this subject are in identical language, but most recently the language objected to was employed in a felonious assault case, State v. Finnell, Mo., 280 S.W.2d 110. There as here the instruction was one of a series and they were read together and following State v. O'Leary, supra, it was held that the instruction was not prejudicially erroneous. As stated, in this case the objectionable phraseology is qualified by further hypothesization and read in the series of which it is a part is not prejudicially erroneous for the reasons now urged. State v. O'Leary, supra; State v. Finnell, supra.

The other assignments of error are related and have to do with the court's refusal to give defendant's offered instructions 15, 16 and 17. Gasche was marshal of a city of the fourth class and instruction 15 stated that he did not have authority to make or attempt an arrest without a warrant, certainly not for a "quasi-criminal" offense, outside the city limits of Pierce City. City of Advance ex rel. Henley v. Maryland Casualty Co., (Mo.) 302 S.W.2d 28. The instruction then hypothesized, if the jury found that Gasche "attempted to unlawfully arrest the defendant" (presumably for running the stop sign), that the defendant had the right to resist, "meet violence with violence * * * *even to the extent of taking the life of his assailant."* Likewise instruction 17 told the jury that as deputy sheriff of Lawrence County he had no authority to arrest in Newton County and if he attempted to make an arrest there for running a stop sign in Pierce City "the defendant would be justified in resisting such an arrest." It is said that the court's refusal to give instruction 15 *"had the effect of ignoring the defense of resisting an unauthorized and unlawful arrest."* (Italics supplied.) It is said that there was no "instruction of any kind on this question" and that "the right of the complaining witness to arrest the defendant was a vital issue going to the very heart of the prosecution."

■ In part the appellant's argument misconceives the theory and force of the right to resist an unlawful arrest. In homicide at least resisting an unlawful arrest does not "furnish a complete excuse for slaying the aggressor." 26 Am.Jur., Homicide, Sec. 223, p. 308. And in the

assault cases "the right to resist an unlawful arrest is a phase of the right of self-defense." 6 Am.Jur.2d, Assault & Battery, Sec. 79, p. 72. As the appellant urges, however, if there is no evidence that he has committed a crime and the officer is making an illegal arrest, it is error to not instruct the jury upon the subject at all, certainly in homicide where resisting the trespass would reduce the offense to manslaughter. Roberts v. State, 14 Mo. 138; State v. Burnett, 354 Mo. 45, 50, 188 S.W.2d 51, 54. But this is not a homicide case, there is no problem here of reducing the offense in degree or grade, and the right to resist an unlawful arrest is not an unqualified right. 6 Am.Jur.2d, Sec. 79, p. 72. And if in his character as constable Gasche was about to arrest Johnnie for the rather minor offense of running a stop sign in Pierce City at midnight; it would seem that shooting the constable three times from the recesses of an automobile is disproportionate to the threatened trespass.

■ And attention must be called to the fact that Hacker v. City of Potosi, (Mo. App.) 340 S.W.2d 166, was overruled by the court en banc in Hacker v. City of Potosi, 351 S.W.2d 760. That decision indicates, at least inferentially, that there are other qualifications on the right to resist an unlawful arrest and that police officers in cities of the fourth class may lawfully perform certain functions or duties outside the city limits—as investigate the presence and identity of a motor vehicle. In the beginning no doubt Gasche pursued Messley because he ran the stop sign, but by the time he approached the stopped automobile in a fusilade of bullets the situation had indeed changed. There is no testimony as to Gasche's purpose at that moment, he had only said, "Get out of the car." Then, in addition to being constable of Pierce City, Gasche was also a deputy sheriff of Lawrence County, and even though outside his territorial jurisdiction could have been acting in a dual capacity on "a dual purpose mission." And here, even though as deputy sheriff he was outside Lawrence County and had no warrant, if there was no offense in connection with the loaded gun (State v. Bordeaux, (Mo.) 337 S.W.2d 47), there was a serious offense by the time the appellant, without warning, shot three times and fled in a barrage of shots. State v. Raines, 339 Mo. 884, 98 S.W.2d 580; State v. Cantrell, Mo., 310 S.W.2d 866. And finally in this case unlike in State v. Browers, 356 Mo. 1195, 205 S.W.2d 721, there were a series of instructions relating to self-defense. And if the principal self-defense instruction erroneously failed to mention or in some manner correctly hypothesize the right to resist an unlawful arrest, the appellant has not objected to that instruction in his motion for a new trial, and in the particular circumstances of this record is in no position to now invoke the plain error provision of Rule 27.20 in support of his claims of error.

■ Proffered instruction 16 is an abstract instruction relating to and emphasizing the subject of "reasonable doubt." No cases are cited in support of the appellant's claim that the court erred in refusing to give this instruction. And in his brief the argument is that the instruction correctly "defined the law of reasonable doubt" and that his rights were adversely affected by the court's refusal to give it. But in the principal instruction hypothesizing and defining the offense reasonable doubt is appropriately interpolated and preceding this the conventional abstract instruction on the subject was given and the court did not prejudicially err in refusing to give another on the same subject. 24B C.J.S. Criminal Law § 1923(2), p. 218; State v. Howard, 324 Mo. 86, 96, 23 S.W.2d 16, 19; State v. Hicks, 319 Mo. 28, 37, 3 S.W.2d 230, 234.

In addition to these specific assignments there is no error with respect to those matters the court is required to consider upon the record before it (Sup.Ct.Rule 28.-02) and for the reasons indicated the judgment is affirmed.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All of the Judges concur.