**STATE of Missouri, Respondent,**

v.

**Willis James JOHNSON, Appellant.**

**No. 55552.**

Supreme Court of Missouri,
Division No. 2.

Nov. 13, 1972.

**492**

John C. Danforth, Atty. Gen., G. Michael O'Neal, Asst. Atty. Gen., Jefferson City, for respondent.

Douglas N. Merritt, Legal Aid and Defender Society of Greater Kansas City, Kansas City, for appellant; Paul T. Miller, Executive Director, Willard B. Bunch, Chief Defender, Kansas City, of counsel.

HENRY I. EAGER, Special Commissioner.

Defendant was convicted by a jury of first degree murder and the jury assessed a term of life imprisonment. He was sentenced accordingly. The case was submitted on the felony-murder doctrine. In defendant's brief no point is made on the sufficiency of the evidence and none on the instructions. We need not relate all the facts in detail from a voluminous record. Defendant was represented at the trial by retained counsel, but here by the Public Defender.

It is admitted that the "7–11" store at 5825 Prospect Avenue in Kansas City, Missouri, was robbed on the evening of March 3, 1969, and that the manager Ralph Binns, was shot through the heart and killed. The store was of a neighborhood type, selling minor grocery items and sundries. It had a check-out counter with two cash registers. There was a small storage area in the rear, shut off by a partition. The front was

largely glass, with a parking area in front of the building. Binns was the only regular employee on duty at the time of the robbery, but there were several neighborhood boys in the store (from 11 to 17 years of age), some of whom performed odd jobs, such as sweeping, stacking bottles, etc. The robbery occurred somewhere around 7:30 p. m.

The defendant and his brother, Lewis Johnson, whose nickname was "Skeeter," had been seen in front of the store around 5:00 p. m. Defendant testified that he was there then with his brother Lewis and Robert Revels; that he used the telephone located in an outside booth, and that he also bought some razor blades. One witness testified that "someone in the group" spoke then of robbing the store. At about 7:30 p. m. two young Negro men entered the store; one, identified as the defendant, proceeded to the counter, held a pistol on the manager, and a shot was fired. No one testified that he actually saw the shot fired, but there was substantial testimony that the man identified as the defendant was the only person in the place with a gun, that he was standing in front of Binns with the gun pointed at him, that a shot was fired, that Binns fell where he had been standing behind the counter, and died. Defendant then put the gun on Keith Owens, one of the boys present, and made him open both cash registers and lay out the money, whereupon he took all but some small change, a net of about $140. One or more witnesses had come out from the back immediately on hearing the shot. A man near the door was holding one of the boys by the neck. Defendant was specifically identified at the trial as the man who held the gun and took the money. According to one witness, defendant's brother Lewis was standing near him. The manager had tried to hide or duck, but one of the men said "Come on out."

One boy had seen defendant and his brother enter the store and heard the shot fired. Another had been standing at a rack in the store, saw defendant at the counter "holding a gun" which was pointed at the manager and ran out, but heard the shot as he ran out. No one had a gun but the defendant. The boy, fourteen years of age, who opened the cash registers, saw defendant standing beside a cash register with the gun, immediately after the shot. The gun was described as a .22 caliber pistol, but it was never found. A .22 caliber bullet was removed at the autopsy and received in evidence. At the time of the shooting defendant had a moustache and "whiskers" extending from it down under his chin. When he appeared an hour or so later at Mary Richmond's, as will be related, he was clean shaven and in his military uniform. It is not shown specifically how defendant and his brother left the scene, but they did not tarry. Defendant had been in Vietnam serving in some type of supply unit; his organization had been returned to California and he was on leave in Kansas City at the time of the shooting.

Mary Joyce Richmond, 17 years old, a high school student, and an acquaintance of defendant, testified: that defendant came to her home near that of his parents on the evening of March 3, clean shaven and in uniform, as stated; that he looked at the TV, talked awhile and then said: "I just killed a man"; that he laughed and she did not believe it; a little later Tim Rice and defendant's brother Tyronne came in and defendant said: "Man, what's going on up at the store?" and Tim said: "Man, the dude's dead." That defendant then said: "I know he was going to die, because I shot him dead in the heart so he couldn't identify me." Mary Richmond was vigorously cross-examined, partially in an attempt to show that she had been intimidated by the police. She stated that defendant had also said that shooting the enemy in the heart was the way he was supposed to kill them in Vietnam. Tim Rice testified that on that same occasion there was some conversation about what happened at the store, and that defendant then said that "he hoped that the man died so he couldn't identify him."

Defendant took the stand and in much detail testified to his activities in his parents' home at the time of the shooting and thereafter, and to other activities later. He denied taking any part in the robbery and shooting. He testified that he shaved that evening because he was going to wear his uniform for his girl friend, and that he could not wear whiskers with a uniform. He admitted being at the 7–11 store around 5:00 p. m. on March 3, 1969. He further testified: that he was upset because just before going to Mary's he had received a letter from a friend stating that his company was going back to Vietnam; that in the conversation with Tyronne and Rice at Mary Richmond's home, he merely said (when told of the robbery and shooting) that it was a shame the way "these boys go around shooting people" and that if someone was shot in the heart, from what he had seen overseas, he probably would not live; that he knew nothing of what had occurred at the store. Several persons testified that defendant's reputation for truthfulness and being "law-abiding" was good. His mother corroborated his presence at her home at the time of the robbery and shooting. Certain other details of the evidence will be referred to in the discussion of the points in defendant's brief.

Defendant's first point is that the Court erred in admitting State's Exhibit No. 7, a photograph showing the body of Binns lying on the floor behind the counter where he fell. The contention is that the photograph was inflammatory, and that it was unnecessary. Essential exhibits should be incorporated into the record or sent here by stipulation. Only after a letter, several phone calls from the clerk, and a delay of more than a week have we been able to procure the exhibit, although it involved a specific point on the appeal. Counsel for appellant is not to be commended for this omission and, as we are informed, it was finally found in his files.

A witness testified that this exhibit showed the area where he saw Binns standing before he heard the shot. It shows the body, on the floor behind the counter lying on its right side, fully clothed, and some spots of what is apparently blood near the head. It is not in color. It is certainly not any more inflammatory than any ordinary photograph of a body with a reasonable amount of blood caused by a gunshot wound. The law on this point has long been settled in Missouri. Defendant cites one case, and that from California, namely, People v. Polk, 63 Cal.2d 433, 47 Cal.Rptr. 1, 406 P.2d 641 (1965). After a discussion of the photo of that murder victim with "bloody undershorts," it was held that the trial court had not abused its discretion in admitting the exhibit, having weighed its probative value against its prejudicial effect. In Missouri, there is a long line of cases on the matter; perhaps one of the fullest discussions is found in State v. Moore, Mo., Banc, 303 S.W.2d 60. There, a photograph of the body of a wife, murdered in her bedroom with a shotgun blast in her chest, and lying on the floor by her bed, was admitted. A part of her forearm had been torn off. The usual contentions of prejudice were made, and also a claim that the photograph was unnecessary in view of the evidence. The Court held: that although such evidence may be inflammatory it is admissible in the discretion of the trial court, if it throws any light upon relevant issues, or shows the nature of the wound, etc.; that the mere fact that there was evidence on the material issues is not conclusive, for such exhibits often give a clearer impression than oral descriptions; that such exhibits are also to be considered as corroboratory of the witnesses, and the State should not be unduly limited in its proof; also, that if such exhibits are "shocking and horrible" it is because the *crime* is one of that sort. It was held that the admission of the exhibit was within the discretion of the trial court. The exhibit there was obviously much more inflammatory than Exhibit No. 7 in our case. The same principles have been announced in the following cases: State v. Stevens, Mo.,

467 S.W.2d 10; State v. Perkins, Mo., 382 S.W.2d 701; State v. Sims, Mo., 395 S.W.2d 445; State v. Blair, Mo., 305 S.W.2d 435; State v. Brandt, Mo., 467 S.W.2d 948; State v. Edwards, Mo., 435 S.W.2d 1. See also, particularly, the recent case of State v. Strong, Mo., 484 S.W.2d 657, decided September 25, 1972.

It is entirely clear here that the Court did not abuse its discretion in admitting State's Exhibit No. 7. It showed the location of the body, and raised a clear inference that the victim was standing in that spot when shot; it corroborated the testimony of certain of the young witnesses whom the defense had vigorously attacked, and particularly that of Timothy Rice, who saw defendant at the counter with a gun pointed at the victim; Rice testified directly that Exhibit No. 7 showed where Binns had been standing behind the counter. The State, which had the burden of proof, was entitled to this corroboratory evidence. There was no error and the point is denied.

Defendant's second point is that the Court erred in limiting the extent of the cross-examination of Timothy Rice concerning a gun. In his brief counsel for defendant states that this concerned *the gun* held by defendant at the time of the robbery, but this is a plain misstatement. The record is as follows: After lengthy testimony by Rice concerning his observations at the scene of the robbery, counsel for defendant asked him about his acquaintance with "Trick" (Robert) Revels and whether he had ever seen him "with a pistol"; the witness stated that he had, possibly a month before this shooting, that he "just showed it to me," and that "he got it from a boy named Albert Smith"; also, that he did not say why he bought it. At this point counsel branched off into a different line of inquiry, showing that "Trick" was around the store about 5:00 o'clock on March 3, 1969, and that the witness tried to collect two dollars which "Trick" owed him. Being directed again to the gun which "Trick" had, Rice testified that it was "grey with black tape around the handle," and that he saw it more than once; when the witness was asked for the *reason* why Revels would exhibit the gun to him more than once, the State objected to that line of inquiry, in that the time was too far removed, that it was not shown that the witness saw the gun inquired about on the day of the robbery or that Revels had a gun then, and that the matter was not relevant to any issue in the case; the State then offered to make the witness available later if the matter became relevant. Counsel for defendant stated that he was trying to show that the witness sold the gun to "Trick," and that such would "impeach his credibility." The Court sustained the objection to "this line of questioning," but permitted counsel to ask the witness whether *he* had sold the gun to "Trick" and the answer was *"no."* At this point counsel made the statement, not a question, "You're under oath." He was further permitted to ask if Rice owned a gun, or had owned a gun, on March 3 (to which the answers were "no"), and further cross-examination continued for about 20 pages of the record.

■ Counsel cite on the point: Bass v. United States (CA 8), 326 F.2d 884; U. S. v. Cardillo (CA 2), 316 F.2d 606; State v. Thompson, Mo., 280 S.W.2d 838. The federal cases arose upon such wholly different facts that a detailed discussion would be useless and confusing. Also, Cardillo involved refusals of witnesses to answer certain questions under privilege of the Fifth Amendment. They stand for the principle that a reasonable latitude must be given to defendant's counsel in cross-examination of witnesses for the prosecution; and the Cardillo case notes a difference in treatment between cross-examination on collateral matters which go only to impeach the witness and upon those which go directly to the issues. In Thompson, supra, the defense was essentially foreclosed from showing that the identifying witnesses had given inconsistent testimony at the preliminary hearing. It was held: that, within

permitted limitations, cross-examination is a matter of right; that a showing of prior inconsistent statements is a permissible method of attacking the testimony of a witness, either through him, or by laying a foundation for testimony from others. But the Court also noted that a reasonable discretion lies in the trial court concerning the extent of cross-examination. The facts in Thompson showed a rather exaggerated example of denial of cross-examination and the case is not at all persuasive on our facts.

■■ It has been held many times that the trial court is permitted a wide discretion in deciding the permissible extent of cross-examination. State v. Hill, Mo., 434 S.W.2d 529; State v. Burchett, Mo., 302 S.W.2d 9. And particularly is this true with reference to collateral matters. State v. Messley, Mo., 366 S.W.2d 390; Hill, supra. And upon cross-examination on collateral matters for the purpose of impeachment the party is bound by the answer of the witness. Messley, supra; State v. Dennison, Mo., 428 S.W.2d 573; Hill, supra.

■ Here counsel was allowed to show: that Rice had seen "Trick" with a gun; that it was "grey" with black tape around the handle; that "Trick" did not say why he bought it; that Rice did *not* sell the gun to "Trick," but that "Trick" got it from one Albert Smith; that Rice never owned a gun. The gun used in the crime was described as a black gun. Counsel for defendant asked permission to ask if Rice sold the gun to "Trick." The witness then, upon inquiry, stated that he did *not* do so, and defendant was bound by that answer. No offer of proof was made and no request for other specific inquiries. The gun which "Trick" had was in no way connected with the one used in the crime, and the whole line of inquiry was thus a purely collateral matter. The specific question asked just before the objection called for rank speculation (the reason why "Trick" would exhibit the gun), and

the whole subject was confusing and misleading to the jury. The Court was entirely within its proper sphere of discretion when it sustained the objection, and it certainly permitted more than a reasonable latitude on this collateral matter. The suggestion that the limitation infringed the constitutional right of confrontation (casually tossed in for the first time in the brief) is wholly without merit. The Constitution does not require that defense counsel be permitted to ask every possible question on any and all collateral subjects, without reasonable and proper limitation. Moreover, no such suggestion was raised at the trial or on motion for new trial. Actually, counsel was permitted to ask the only further question which he indicated that he wanted to ask; and he got an answer which he did not like, but which was binding. There was no conceivable error on this point, and it is denied. The statement of counsel to the witness that "You're under oath" was argumentative and wholly improper and there was no error in sustaining an objection to it.

■ Defendant's last point is that the Court erred in refusing to admit "Police Reports as Evidence under the Uniform Business Records Act." Sections 490.660–690, V.A.M.S. This question arose when Detective Virgil Braden was on the stand. He had with him a copy of the Homicide Department report which he had made and filed. One part of this showed his interviews with certain witnesses, including one Shelton Fitzpatrick, who testified at the trial. At that time defendant had not been arrested or charged. Defendant takes the position that the report as such was admissible in evidence as a Business Record, and that such records should be produced for defendant's use, citing Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.

We review what actually happened. Braden testified on cross-examination that he talked to "some more boys that were witnesses," including Shelton Fitzpatrick, and he thought that he showed them some

photographs. Counsel for the State, on redirect, *produced* a police report, and Braden identified it as his own, and stated that it included his interview with Shelton and another boy. On cross-examination counsel for defendant asked: "May I look at your report, sir?" The witness answered "yes," and counsel for defendant, stating that his recollection was now "refreshed," *asked him numerous questions suggested by the report.* Counsel then offered to read to the witness for verification certain notes of the interview with Shelton. An objection was made that he could ask questions and the witness could use the report to refresh his memory, but that the actual reading of the report was improper "without asking him the question ahead of time." The objection was sustained. Counsel for defendant then asked many specific questions, including *what* Shelton had told him, and the witness referred to the report; specifically, he related much detail of what Shelton stated, including minute descriptions given by Shelton of the men who entered the store immediately before the shooting and their clothing, the statement that two shots were fired; also, that Shelton was shown certain photographs, that he said that one partially resembled the man; that Shelton did not, in this interview, implicate the defendant. Braden also related certain statements of Rory Fitzpatrick.

This is not a question of *"discovery,"* as counsel argues, and as the cited Missouri cases dealt with. Defendant's counsel had the full report in his actual possession and examined the witness from it at great length. If he did not bring out by his interrogation everything that he wanted from the report, it was his own fault. The "fairness" and "justice" of discovery of police records have nothing to do with this situation. Nor are we dealing with any "suppression" of records, documents or evidence. The argument that the report was not "read" is a "tempest in a teapot." The defendant could not possibly have been prejudiced. It would be useless, therefore,

to consider further the admissibility of such reports as "Business Records" under our statutes. Nor have we decided the point made by the State that the records were not sufficiently qualified as such; there is some doubt that they were. The point is of no merit.

Finding no prejudicial error, the judgment is affirmed.

PER CURIAM:

The foregoing opinion by HENRY I. EAGER, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.