**STATE of Missouri, Respondent,**

v.

**Robert L. LOGGINS, Appellant.**

**No. WD 33146.**

Missouri Court of Appeals,
Western District.

Nov. 30, 1982.

As Modified Feb. 8, 1983.

David M. Strauss, Public Defender, Michael C. Teel, Asst. Public Defender, Columbia, for appellant.

John Ashcroft, Atty. Gen., William K. Haas, Asst. Atty. Gen., Jefferson City, for respondent.

Before MANFORD, P.J., and WASSERSTROM and KENNEDY, JJ.

MANFORD, Presiding Judge.

This is a direct appeal from a judgment entered in accordance with a jury conviction for assault, first degree, a Class A felony under § 565.050, RSMo 1978. The judgment is affirmed.

On appeal, three points are presented which charge the trial court with error in (1) overruling appellant's motion for continuance premised upon the unavailability of certain defense witnesses; (2) overruling appellant's challenge to a juror for cause; and (3) overruling appellant's motion for continuance because of the heat in the courtroom.

While appellant makes no specific challenge to the sufficiency of the evidence, a summary of pertinent evidence must be included because of the points raised.

On September 1, 1980, appellant was an inmate at Renz Farm, a Missouri correctional facility. At about 8:00 or 8:15 p.m. on the evening of September 1, 1980, a fight involving several inmates broke out in the "yard". Respondent called three correctional officers who were on duty that evening.

In summary, these officers testified that after becoming aware of a disturbance or fight in the yard area, they entered that area from different approaches and observed several inmates fighting. Concerning appellant, these officers testified as follows:

The first officer stated he entered the yard area and observed appellant and one Anthony Thompson (the victim of the charged assault) fighting. Thompson was on his hands and knees, and appellant struck Thompson on the top of the head with a wooden mallet. (This was described as a device used for laundry of prison clothing resembling a croquet mallet.) The second blow caused the mallet to break. Thompson fell to the ground. The officer took the stick portion of the mallet from appellant and threw it over the fence. (The item was later retrieved and introduced as an exhibit at trial.)

The officers began separating the inmates and leading them through gates out of the yard area. Another officer was assisting Thompson, who could not walk. As Thompson and the officer approached the gate, appellant struck Thompson in the face with his fist. The second officer testified that after learning of the disturbance, he entered the yard and observed a fight in progress between several inmates. This officer observed appellant with a length of steel pipe, and appellant was jabbing and striking Thompson with it. This officer took the pipe from appellant and "shoved it" through the fence. (This item was later retrieved and introduced as an exhibit at trial.) This officer stated that he observed appellant strike Thompson on the head with the length of pipe two or three times, while Thompson was "half standing and half laying between the fence and the ground."

After taking the pipe from appellant, this officer tried to break up other fights, and appellant left his immediate presence. This officer later observed appellant striking Thompson with the mallet. This officer heard appellant tell Thompson while appellant was striking Thompson with his fists, "I am going to put you out for good you mother fucker."

The third officer testified that he heard someone yell, "fight", and he entered the yard area. This officer first observed appellant and another inmate named Nauman engaged in a fight. He then observed appellant enter the prison laundry room and return to the yard with the laundry mallet. He observed appellant approach Thompson and strike Thompson several times with the mallet. This officer later observed appellant with a length of pipe approach and strike Thompson with the pipe. This officer again observed appellant strike Thompson with his fist as Thompson approached the exit gate. All three officers testified that Thompson was injured (extent unknown) and blood was spattered. Thompson's injuries were confirmed by subsequent medical testimony. The injuries included multiple abrasions and bruises, plus a large scalp laceration and a fractured skull. The three officers also testified that they never observed Thompson strike appellant.

Part of the state's case included reading the jury the previous trial testimony of Anthony Thompson. This testimony becomes a focal point of appellant's first alleged error. For the moment, it suffices to say that Thompson had very little recall about the details of the night of September 1, 1980. He stated that he did remember a fight. When asked, "Between who?", he responded, "I am not sure who it was." When asked, "Do you remember being struck on the head?", he responded, "No."

The defense then offered evidence. Nine witnesses who were inmates at Renz Farm on September 1, 1980 were called. In addition to these witnesses, the jury was read the previous trial testimony of former inmate, Victor James. In summary, the James testimony revealed that James observed Thompson and appellant involved in the "disturbance". James stated that he observed appellant "breaking up a fight" and that he never observed appellant in possession of any type of weapon. James testified that the "disturbance" had originated earlier (at about 5:15 p.m.) in the kitchen area of the dorm, was racially motivated, and erupted later in the yard area. James testified that he never observed the fighting out in the yard area.

The nine witnesses who appeared testified in summary as follows:

Inmate Madison stated that he was sitting on the front steps of the mess dorm and was struck from behind (around the ear and lower back) by Thompson with a pipe. A fight erupted, involving other inmates. This fight lasted some 10–12 minutes. In response to questions, he stated that he did not observe anyone strike appellant, and did not observe appellant strike Thompson. On cross-examination, Madison was asked, "But you don't know if Loggins hit anyone?", and he answered, "No, I couldn't say."

Inmate Phillips, the next witness, stated that there had been fights in the kitchen and another in the dormitory which preceded the fight in the yard. Phillips testified that he never saw Thompson struck by anyone. This witness stated that he observed Thompson stick appellant in the leg with a screwdriver and at that moment, he (Phillips) was struck from behind with a pipe. On cross-examination, Phillips was asked, "If he (Thompson) got hit, you have absolutely no idea who did it?" He responded, "I have absolutely no idea that he got hit."

Inmate Calmese testified that he observed the fighting, got hit himself, and attempted to separate the others. He stated that he did not observe appellant strike Thompson. On cross-examination, he stated that he did not observe appellant or Thompson the entire time the fight ensued, and then answered when asked, "So, if someone hit Thompson, if for instance Loggins hit Thompson you might not have seen that, is that right?" (Answer:) "If he had of hit Loggins, I wouldn't see him." When

asked "If Loggins had hit Mr. Thompson, might that have happened without you seeing it?", he responded, "Sir, in the position I was in, I couldn't see how he (appellant) could have did, because I was standing there at the fence." This witness then further stated he did not watch appellant the entire time.

The previous trial testimony of inmate Paige was then read. In summary, Paige testified that he observed a fight between several inmates, including Thompson, but did not observe any weapons (the pipe and mallet) or appellant strike Thompson.

Inmate Steward, the next witness, stated (in summary) that he observed "some" of the fight, but could not "recall" if appellant and Thompson were involved. He stated that he observed no weapons, and did not see appellant strike Thompson.

Inmate Slaughter (a female inmate housed adjacent to the male dormitory), stated that she observed the fight involving several inmates, never observed any weapons, and did not see appellant strike Thompson. She stated that several other inmates struck Thompson.

Inmate Young, also a female inmate, stated she observed several male inmates fighting. She stated she saw Thompson being struck by "some sort of stick or something" by another inmate, not appellant.

Inmate Claybourne, another female inmate, testified that she observed the fight, including a fist-fight between appellant and Thompson. She did not observe any weapons, nor did she know who struck the first blow.

Inmate Sanders testified that the fight started when an inmate named Nauman attacked appellant, and another inmate named Burns attacked yet another inmate named Madison. This witness testified that he never observed any weapons, nor did he ever see appellant strike Thompson. This witness stated that Thompson was not even around appellant during the fight.

Appellant then took the stand. This followed an examination by the court regarding appellant's right not to testify. Appel-

lant acknowledged that he understood and voluntarily chose to testify in his own behalf. In summary, appellant testified that there were a "couple" of fights the night of September 1, 1980. He stated that he sustained injury, including a stab wound in his leg, but did not know who stabbed him. He testified that he observed "pipes" being used in the fight, but no mallets. On direct-examination, he was asked, "Did you during the course of this fight strike Anthony Thompson?", and responded, "No, sir. Not to my knowledge, I didn't strike him." He was further asked, "Is it possible that you did?", and he answered, "As far as in the midst of in the biggest part of it, as far as everyone was trying to break it up at first, before I started defending myself, yes, I could have, you know, I could have." Appellant denied ever striking Thompson with either the mallet or pipe. On cross-examination, appellant stated that he and inmate Nauman were struggling over a pipe, and the pipe was taken from them by either a guard or other inmates. Appellant admitted that "early in the brawl" he could have hit Thompson with his fists. He stated that three officers had given false testimony regarding his striking Thompson with a pipe and/or mallet.

The evidence closed. After due deliberation, the jury returned its verdict of guilty. The court entered judgment in accordance with the verdict. Following the denial of timely filed after-trial motions, this appeal was filed.

Under point (1), appellant contends that the trial court erred in its refusal to grant him a continuance because of the unavailability of defense witnesses. His contention centers around the absence of Thompson, James and Madison. In fact, Madison appeared for trial and testified, negating this portion of appellant's contention on its face.

Appellant points out he advised the state that he wanted Thompson to appear and requested Thompson's address so that he could be subpoenaed. (The record reveals that Thompson had been released on parole from Renz Farm). The state provided Thompson's address the day before trial.

Thompson had been released to parole/probation authorities in Tennessee. It was obvious that Thompson could not be available for trial. Appellant now contends that the testimony of Thompson was critical to the defense because it would create doubt whether appellant caused the injuries to Thompson.

Appellant further complained that the state had not placed detainers on Thompson, James, and Madison in order to hold them for trial as witnesses. Appellant now charges prejudice as to a fair trial because Thompson's "attendance most probably would have been obtained had the state not prejudiced the Defendant by providing Thompson's out-of-state address the day before trial."

The record reveals that appellant was first tried on this charge, resulting in a finding of guilty by the jury on January 14, 1981. On March 11, 1981, the court granted appellant a new trial because of racial comments by the prosecutor in closing argument. The case was set for retrial on April 29, 1981. On April 29, 1981, respondent appeared ready for trial. Appellant did not show up and instead, a party named Muhammed Nuriddin appeared for appellant and requested a continuance. Due to appellant's failure to appear, a capias warrant was issued for appellant's arrest. The trial was reset for June 10, 1981. Appellant was arrested on either June 4th or 5th, 1981. When purported counsel Muhammed Nuriddin did not appear on June 10, 1981, trial was continued and reset for July 14, 1981 upon appellant's request.

Before trial, appellant secured writs of habeas corpus ad testificandum for the appearance of defense witnesses in custody. It must be remembered that during this interim, Thompson, James, and Madison were released from custody in Missouri. What had occurred of course, because of the trial delay, is that these three witnesses were no longer available from Renz Farm.

On the morning of trial, appellant alternatively moved to dismiss the charge or to grant a continuance because of the unavailability of Thompson, James, and Madison. The alternative motion was overruled. The trial court, in denying the alternative motion, specifically found that appellant's own conduct had caused the delay of the trial.

The jury was selected. Just prior to the submission of evidence and following a noon recess, counsel for both the state and appellant appeared before the court and advised the court on the record that a stipulation had been entered. This stipulation revealed the agreement that the previous trial testimony of Thompson, James, and Madison could be used in lieu of the presence of these three witnesses. During the presentation of the stipulation, the court inquired of defense counsel if he was aware of the recent decision by this court in the case of *State v. Gray,* 616 S.W.2d 102 (Mo. App.1981).[1] Counsel advised the court that he was familiar with that decision and still agreed to the use of prior trial testimony. Details as to how the previous testimony was to be presented were agreed to and trial commenced.

As noted above, Madison did appear for trial and testified on appellant's behalf. Under appellant's point (1), the determination to be made by this court is whether the court erred in refusing a continuance due to the absence of Thompson and James. Consideration of this question necessarily includes this court's ruling in *Gray,* along with the substance of the previous testimony of Thompson and James as to how that testimony relates to appellant's contention that someone else caused injury to Thompson.

In *Gray,* this court, with dissent, ruled that the state has the burden of proving a good faith effort and the exercise of reasonable diligence to obtain the presence of a witness otherwise unavailable for trial. This court noted that such is required by

---

1. It should be noted that in *Gray,* the burden of proof fell to the state as the party seeking to use the witness's prior testimony. This burden has been held to apply to any party seeking

application of the statute. See *State v. Ivory,* 609 S.W.2d 217 (Mo.App.1980) and *State v. Sykes,* 611 S.W.2d 278 (Mo.App.1980).

§ 491.400–491.450, RSMo 1978 in support of an accused's right of confrontation guaranteed by the United States Constitution, Amendment VI, and by Mo. Const. Art. I, § 18(a). Under the facts and circumstances in *Gray,* this court, with dissent, found that the state had not proven a good-faith effort and the exercise of reasonable diligence to obtain the presence of the witness.

■ The instant case contains certain additional elements which distinguish this case from the narrow ruling in *Gray.* It was necessary to schedule a second setting in *Gray* due to the failure of Gray to appear, but unlike the instant case, *Gray* did not involve a series of trial delays as caused by appellant herein. In addition, unlike the instant case, the defendant in *Gray* objected to the use of previous trial testimony on the basis of a denial of the constitutional right of confrontation. In the instant case, appellant agreed, by stipulation, that the previous trial testimony could be introduced in lieu of the appearance and testimony of three witnesses. This court concludes that this stipulation amounted to a voluntary waiver of appellant's rights under § 491.-400–491.450; U.S. Const.Amend. VI, and Mo. Const. Art. I, § 18(a). This constitutional right is personal and can be waived, *Johnson v. Zerbst,* 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), so long as it is knowing, intelligent and voluntary. *Miranda v. State of Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966), cited in *United States v. Oliver,* 525 F.2d 731 (8th Cir.1975). See also *Phillips v. Wyrick,* 558 F.2d 489 (8th Cir.1977); *State v. Ward,* 622 S.W.2d 354 (Mo.App.1981), citing *State v. Cheeks,* 604 S.W.2d 30 (Mo.App. 1980) and *State v. Warren,* 579 S.W.2d 723 (Mo.App.1979). .

■ It is to be noted that our cases construing § 491.400–.450 do not specifically address the question of waiver by an accused as to compliance with the statute by the state, nor has our research revealed this question to have been decided previously. The enactment of our statute rests upon the basic constitutional guarantee of the right of confrontation as prescribed by U.S.

Const.Amend. VI and Mo. Const. Art. I, § 18(a). It is unquestioned that no statute possesses validity which contravenes a constitutional guarantee. If such contravention is discovered, the statute must give way to the supremacy of the constitution. It is also without question that the 6th Amendment is applicable to the various states via the 14th Amendment. The situation then is if this constitutional guarantee is personal, and it is, and it can be waived, as it can, *State v. Ward, U.S. v. Oliver,* and *Phillips v. Wyrick, supra,* then it must be concluded that § 491.400–491.450 can neither prohibit nor deny an accused this personal guarantee or right; nor can that same statute prohibit or deny an accused his right to waive his right to confrontation. If this right to confrontation and the waiver thereof arise directly from federal and state constitutional guarantees, then the statute must be construed in conformity with those constitutional rights. If an accused has the right and can waive the right directly under the constitution, then he must be found to possess the same right and be entitled to waive the right under the statute as well. This is precisely what occurred in the instant case and the record reveals that there was a knowing, voluntary waiver of the right of confrontation by the stipulation that the previous trial testimony of Thompson, James and Madison could be admitted in lieu of the presence of those persons as witnesses.

In order to better understand the rationale of the conclusion reached by this court on the question of waiver, as opposed to a mere declaration by this court that waiver can be entered, coupled with the direct disposition of appellant's point (1), the substance of the previous trial testimony of Thompson and James and the issue to which that testimony relates must be considered.

■ Appellant, through counsel, contended before the trial court that "additional information has come to me from the disclosures provided by the state which would require that I ask Mr. Thompson some different questions than the first time . . . I wanted him here as a witness . . . regard-

ing the facts and circumstances of the altercation at Renz Prison Farm." The record does not disclose what "disclosures" by the state counsel was referring to in his comments. It is apparent, both from the record and appellant's brief, that appellant's contention was that he did not cause the injuries to Thompson. It should be noted in *State v. Sykes,* 611 S.W.2d 278 (Mo.App. 1980) that unsupported statements are not sufficient to grant application of the act. See also *State v. Ivory,* 609 S.W.2d 217 (Mo.App.1980). To be sure, in *Sykes* and *Ivory,* the issue was the direct application of §§ 491.400–491.450, whereas in the instant case, it is a question of indirect application via the denied request for a continuance. However, such distinction is of no importance to the determination of the critical question.

Appellant has maintained the continuous position that he did not strike Thompson with a mallet or pipe, and did not cause Thompson's injuries. With that in mind, the most favorable view of Thompson's testimony to appellant would be that Thompson did not know who struck him, appellant did not strike him or someone else struck him. Close scrutiny of Thompson's testimony in the first trial reveals that appellant did receive the optimum from Thompson's testimony. Thompson testified on both direct and cross-examination as follows:

"Q. Mr. Thompson, will you tell the jurors your name, please?

A. Anthony Thompson

Q. Where were you residing on September 1, 1980?

A. At Renz Farm.

Q. Where were you within the Renz Farm facility between 8:00 and 8:30?

A. Probably outside.

Q. Probably outside? Aren't you sure?

A. Well, I don't know what time it was.

Q. Were you outside that evening at all?

A. Yeah, I think so.

Q. Do you know approximately what time you went out there?

A. No, I don't.

Q. Do you remember who you were with?

A. I don't know for sure, but I think I was with Leon Burns.

Q. What, if anything, do you remember about that particular occasion?

A. Well, I don't remember too good. Like I said before, I don't remember too much about what happened.

Q. What do you remember?

A. I remember there was a fight and I tried to break it up.

Q. Between who?

A. I am not sure who it was.

Q. Do you remember being struck on the head?

A. No.

Q. At any time during that evening. (Witness shakes head)

THE COURT: Sir, your answer is no?

THE WITNESS: No, right.

Q. Had you any head wounds before you went out to the yard that evening?

A. No, I didn't.

Q. Had you a skull fracture before you went out to the yard that evening?

A. No.

Q. Had you been unconscious before you went out to the yard that evening?

A. No.

Q. Did you give anyone any permission to injure your skull that evening?

A. No, I didn't.

Q. What's the next thing you remember after being out in the yard?

A. Next thing I remember was probably waking up at Columbia.

Q. Do you remember on September 1, 1980, striking anyone?

A. No.

Q. Are you saying you didn't or you don't remember?

A. I don't remember. If I did, I don't remember it. I don't think I did.

MR. STERNER: (Asst. Pros. Atty.) No further questions.

THE COURT: You may inquire.

---

Testimony of Anthony Thompson taken on Tuesday, January 13, 1981, read by Mr. Cave: (Asst. Public Defender)

Q. You don't remember a whole lot about that night, do you, Mr. Thompson?

A. No, I don't.

Q. Do you know whether or not there was a fight at all at Nine Dorm Yard that night?

A. Yeah, there was a fight, but I don't remember really what was going on.

Q. Leon Burns involved in it?

A. Sir?

Q. Was Leon Burns involved in that fight?

A. Yeah, he was sitting beside me. I think he was, yes.

Q. You think he was sitting beside you?

A. I know he was sitting beside me. I'm not sure. It was really a long time ago and the whole thing is a blur, because like I said, I had a fracture.

Q. You found out later you had a fracture?

A. Yeah. That's what they told me. I don't know.

Q. You don't know how you got that fracture, do you?

A. No, I don't know.

Q. You don't know whether you fell or somebody hit you; and if somebody hit you, who it was?

A. No.

MR. CAVE: Nothing further.

THE COURT: Redirect.

MR. STERNER: No redirect.

THE COURT: You may step down."

■ From the foregoing, the obvious question is what more could Thompson have testified to regarding who struck him? Unless it is presumed that at the second trial, Thompson would have perjured himself by stating that someone else and not appellant struck him (and such presumption cannot and will not be entertained by this court), appellant received the optimum of Thompson's testimony. There is no merit to appellant's contention that he was prejudiced by the refusal of the trial court to grant him a continuance, or that he was prejudiced by the absence of Thompson as a witness. The substance of Thompson's testimony inured to the benefit of appellant, not to his prejudice as contended.

What of the testimony of James? The record shows that a subpoena was issued for James, but service thereof was not had before trial. It is unnecessary to restate the issues and questions surrounding the statute waiver as noted above, but we can take up the testimony of James and consider it directly in light of its substance and appellant's claim that he was prejudiced because James did not appear for trial. Once again, the question is what is the optimum of that testimony in appellant's favor?

"Q. For the jury, would you tell them your name; and for the Reporter, would you spell it, please.

A. Victor James, V-i-c-t-o-r J-a-m-e-s.

Q. Mr. James, where do you live, sir?

A. St. Louis, Missouri.

Q. Where are you residing at the moment?

A. Tipton Honor Center.

Q. How long have you been there?

A. Since December 12.

Q. On September the 1st of this year, were you at Renz Prison Farm?

A. Yes, sir.

Q. Are you aware of any disturbance that occurred at Renz Prison Farm on September 1st?

A. Yes, sir.

Q. What time of day did this disturbance occur?

A. Around about 5:15.

Q. Where did it occur?

A. In the Kitchen.

Q. Do you know this gentleman sitting right here?

A. Yes, sir.

Q. Did you know Anthony Thompson?

A. Yes, sir.

Q. Were they involved in that disturbance?

A. What do you mean involved?

Q. Were either of them involved in any way in that disturbance?

A. Yes, sir.

Q. Which one, this gentleman or Mr. Thompson?

A. Mr. Loggins.

Q. This gentleman right here?

A. Yes, sir.

Q. What was his involvement in that disturbance?

A. Breaking up a fight.

Q. Did you observe him to possess any weapon at that time?

A. No, sir.

Q. Did you see any fights later on in the day?

A. No, sir.

Q. Were you a resident of Nine Dorm?

A. Yes, sir.

Q. Were you aware of any other disturbance besides the one that occurred in the dining room that you just talked about?

A. No, sir.

MR. CAVE: Nothing further, Your Honor.

THE COURT: You may inquire.

MR. STERNER: No cross-examination."

From the foregoing, it is clear that James never witnessed the fights or disturbances which occurred in the yard area and which provided the evidence for the offense which appellant stands convicted. In addition, the testimony of James declares that appellant was engaged in breaking up an earlier fight (5:15 p.m.) in the kitchen, and that James never observed appellant in possession of any weapon. Thus, absent any perjury at the second trial (which will not be presumed by this court), appellant enjoyed the optimum of the James testimony. There is no merit to appellant's contention that he was prejudiced by the refusal of the trial court to grant him a continuance or that he was prejudiced by the absence of James as a witness.

As noted above, appellant makes the same allegation regarding witness Madison. This contention fails because Madison appeared at the second trial and testified on appellant's behalf.

This court would be remiss if it failed to note that the previous trial testimony of one Hervis Paige was also read to the jury. The same reasoning concerning the statutory waiver as to the testimony of Thompson and James applies equally to the testimony of Paige. That testimony was as follows:

"Q. Would you state and spell your name, please?

A. Hervis Paige, H-e-r-v-i-s P-a-i-g-e.

Q. Mr. Paige, where do you currently reside?

A. Tipton Pre-Release Center.

Q. Is that part of the Missouri Department of Corrections?

A. Yes, it is.

Q. On September 1 of 1980, where did you reside?

A. Renz Correctional Center.

Q. Here in Callaway County?

A. Here in Callaway County.

Q. At approximately 8:20 in the evening that day, were you aware that there was a scuffle or series of fights going on in Nine Dorm Yard at Renz Prison Farm?

A. Yes.

Q. Were you a part of that scuffle?

A. Yes, I was.

Q. Do you know Robert Loggins?

A. Yes.

Q. Do you know Anthony Thompson?

A. Yes.

Q. During that scuffle did you see Robert Loggins strike Anthony Thompson with his fist or with any instrument?

A. No, I didn't.

Q. Did you have an opportunity to observe their entire fight?

A. Excuse me? What did you say?

Q. Did you have an opportunity to observe the entire fight?

A. Yes, I did.

Q. Specifically, Mr. Paige, I show you now what's been marked as State's Exhibit 2. Did you see Mr. Loggins strike Mr. Thompson with this instrument or anything that looked like it?

A. No, I didn't.

Q. Did you see any instrument like this or this instrument that night?

A. No.

Q. I show you now what's been marked as State's Exhibit Number 1. Specifically, did you see Mr. Loggins strike Mr. Thompson with this instrument or anything like that?

A. No, I didn't.

Q. Did you see this instrument or anything like it during the fight that night?

A. No.

Q. I show you now State's Exhibit Number 3 and ask you the same question.

A. No.

Q. You didn't see Loggins strike Thompson with this or anything like it?

A. No, I didn't.

MR. CAVE: Nothing further.

THE COURT: You may inquire.

---

Testimony of Hervis Paige taken on Wednesday, January 14, 1981, read by Mr. Sterner:

Q. Did you see anyone strike Thompson?

A. No.

MR. STERNER: Thank you. No further questions.

THE COURT: Any redirect?

---

Testimony of Hervis Paige taken on Wednesday, January 14, 1981, read by Mr. Cave:

Q. Did you see Thompson strike anyone?

A. I saw him fighting in the yard.

Q. Do you know who he was fighting with?

A. No, I can't recall who he was fighting with. There was about 30 or 40 of us out there fighting that night.

MR. CAVE: Nothing further.

THE COURT: Recross.

MR. STERNER: No recross."

It can be observed from the Paige testimony that he never observed appellant strike Thompson with either his fist or any weapon. Thus, as with the testimony of Thompson and James, appellant also received the benefit of the Paige testimony.

Perjury will not be presumed by this court. There is no merit to appellant's contention that he was prejudiced by the refusal of the trial court to grant him a continuance or that he was prejudiced by the absence of Paige as a witness.

■ In addition to our finding that the trial court did not abuse its discretion upon refusal to grant a continuance, such action is discretionary and will not be set aside on review unless an abuse is shown. *State v. Ashley,* 616 S.W.2d 556, 558 (Mo.App.1981). This court concludes that appellant, via the stipulation to utilize the previous trial testimony of Thompson, James and Paige, knowingly, intelligently and voluntarily entered his waiver of his right of confrontation under the 6th Amendment to the United States Constitution, Mo. Const. Art. I, § 18(a) and §§ 491.400–491.450, RSMo 1978. Further, upon the whole of the facts and circumstances herein, appellant has failed to show how he was prejudiced.

There is no merit to appellant's point (1) and it is ruled against him.

Under point (2), appellant charges that the trial court erred in overruling his challenge to a juror for cause. Disposition of this point requires a brief reference to the pertinent voir dire record:

"MR. CAVE: Do any of you know Julia Kaufmann? You are Miss Craig? What's your acquaintanceship with Miss Kaufmann?

VENIREMAN CRAIG: Well, I have known the Kaufmann family for several years and we go to the same church and everything.

MR. CAVE: Julia works in the Prosecutor's office. Did you know that?

VENIREMAN CRAIG: Yes.

MR. CAVE: You visit back and forth with her family?

VENIREMAN CRAIG: Not in the home.

MR. CAVE: But church functions and things like that?

VENIREMAN CRAIG: Yes.

MR. CAVE: Knowing that, or because of your relationship with Julia Kaufmann, is there any reason at all you would not be

able to give the Defendant a fair trial in this case, knowing someboy (sic) you are personally acquainted with and go to church with is involved in the prosecution's side of the case? You think you might tend to believe her employers more than you would believe me or the Defendant's witnesses?

VENIREMAN CRAIG: Possibly.

MR. CAVE: You think that's possible?

VENIREMAN CRAIG: Yes.

MR. CAVE: In other words, because she's such a nice person, other people who associate with you are obviously nice too?

VENIREMAN CRAIG: Yes."

Following the above, the record reveals:

"Now, during the trial of this case witnesses will be called. They will be asked questions by the State and by me and that will be the evidence upon which you will decide this case. The law as it relates to the charge of what the criminal law of the State of Missouri is would be given to you by the Court in written instructions. Are there any of you who would not be able to put aside any personal feelings that you have and follow the instructions of the Court as they are given to you?

I take it by your silence that you would all be able to follow the Court's instructions."

The record further reveals:

"MR. CAVE: I'm sorry, Your Honor. I have one other one, Juror 27, Lillian Craig, who knows the secretary Julia Kaufmann and said she would have to believe the people that associated with Julia who are the prosecution's staff.

MR. STERNER: I think he's correctly recalled what they said. I wouldn't have anything else to say.

THE COURT: Defendant's challenges to Juror 18 and 22 are sustained. Challenge to Juror 26 (sic, should be 27) is overruled."

Appellant contends that the court erred in not striking for cause Juror 27, citing to this court his constitutional right to a trial by an impartial jury. (Mo. Const. Art. I, § 18, [1945]). In addition, appellant refers

this court to *State v. Foley,* 144 Mo. 600, 46 S.W. 733, 735 (1898); *State v. Morrison,* 557 S.W.2d 445–446 (Mo. banc 1977) and *State v. Land,* 478 S.W.2d 290, 291–292 (Mo.1972).

*Foley* ruled that an accused is entitled to a full panel of qualified jurors before he is required to make his peremptory challenges. *Morrison* reaffirmed the ruling in *Foley*. *Land* spoke to the situation where reversible error occurred where the trial court did not strike a venireman for cause who had indicated he might subconsciously "lean a little toward the state."

■ The determination of jury qualification lies within the discretion of the trial court and its decision will not be set aside absent a showing of an abuse of that discretion. *State v. Murphy,* 610 S.W.2d 382, 389 (Mo.App.1980). Appellant contends that the challenged veniremen's statements made it clear that she would tend to favor the state due to her friendship with one Julia Kaufmann. Appellant contends that this case is squarely within *Land, supra.* *Land* does not control because in *Land,* the refusal by the court to strike for cause followed the court's finding that the prospective juror might subconsciously "lean toward the state." That ingredient is lacking in the instant case.

■ It can be noted from the venireman's responses to inquiry that she observed the employee known to her to be in the category of a nice person. It can also be observed that the contact or association between the two was through their mutual church affiliation and not an otherwise social or inter-family relationship. That both were members of the same church fails to sustain a challenge for cause. *State v. Cashman,* 485 S.W.2d 431, 434 (Mo.1972).

It is further noted that the court subsequently inquired whether prospective jurors could put aside personal feelings and follow the court's instructions. The challenged venireman did not respond to the court's inquiry. This inquiry by the court was essentially a further clarifying inquiry, and when there was no further response, any initial equivocation by the challenged venireman

was cured or resolved. The record reveals that appellant struck the venireman from the panel.

Under the facts and circumstances of the instant case and upon review of the entire voir dire examination, it cannot be said that the trial court abused its discretion upon its refusal to strike the challenged venireman. Point (2) is found to be without merit and is ruled against appellant.

■ Under his final point (3), appellant contends that the court erred in its refusal to grant him a continuance based upon the heat in the courtroom. The record reveals that this case was tried (second trial) in the middle of summer (July 14 and 15, 1981) and that the air-conditioning provided the courtroom was not operational. The grant or denial of such continuance lies within the discretion of the trial court. *State v. Ashley, supra* at 558.

Appellant contends that this heat prevented the jurors from concentrating on the evidence and to devote their full attention to the serious matter at hand. Appellant refers to Rule 24.08, which permits for good cause the continuance of a criminal trial.

The trial court recognized the hot conditions and attempted to reduce the effects by installing fans. Respondent opposed this continuance, noting that the case would probably be docketed in October, 1981. In ruling upon appellant's motion, the trial court noted the prior delays of the trial of this case, the further "disappearance" of witnesses each time it was continued, and concluded that "this trial by continuance would not serve the interest of justice ..."

It is apparent from the record that the courtroom did not have the benefit of air-conditioning and that the room was hot due to the summer heat. Appellant attempts to persuade this court into thinking that these adverse conditions were applicable only to appellant. Common sense would advise that the respondent and its witnesses were subject to the same conditions. The trial court weighed these conditions against previous delays occasioned by appellant, the loss of witnesses occasioned by those delays

and the totality of the interest in justice in disposing of the trial of the case.

■ The trial court did not abuse its discretion in its denial of appellant's motion for continuance upon the basis of a heated courtroom due to the failure of air-conditioning facilities.

There is no merit to appellant's point (3) and it is ruled against him.

The judgment is affirmed.

KENNEDY, J., concurs.

WASSERSTROM, J., concurs in separate concurring opinion.

WASSERSTROM, Judge, concurring.

I agree with the principal opinion in all respects other than its discussion of Sections 491.400–491.450, as interpreted by *State v. Gray,* 616 S.W.2d 102 (Mo.App. 1981), and the discussion of waiver of rights thereunder. In my view, those problems are not here involved. The discussion mentioned is therefore unnecessary and may create future confusion.

In *Gray,* the defendant objected to the state's use of prior testimony, and it was held that the state could not use the testimony because a diligent effort had not been made to secure the personal attendance of the absent witness as would have been possible under the cited statute. In the present case, appellant made no objection to the state's use of the prior testimony and makes no point on appeal respecting the admission of that testimony.

Rather, what appellant wanted was a continuance so that he could subpoena Thompson. The state made no objection on the ground appellant had not made an earlier diligent effort, nor could any such objection have reasonably been made under the circumstances. The state's objection to a continuance and the court's denial of the request were on different grounds, wholly unconnected with the *Gray* doctrine.

With the exception above noted, I fully concur in the principal opinion.